**FIFTH THIRD BANK et al., Appellants,**

v.

**COPE et al., Appellees.**

[Cite as *Fifth Third Bank v. Cope*, 162 Ohio App.3d 838, 2005-Ohio-4626.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA2004–05–059.

Decided Sept. 6, 2005.

840

Statman, Harris, Siegel & Eyrich, L.L.C., and Lawrence A. Flemer, for appellants.

Rendigs, Fry, Kiely & Dennis, L.L.P., and Steven Hengehold, for appellees the estate of James L. Ross Sr., James L. Ross Jr., and the Gross Partnership.

John H. Engle, for appellee William Landis.

Freund, Freeze & Arnold and Kevin C. Connell, for appellees village of Carlisle and Matthew Coppler.

WALSH, Judge.

{¶ 1} Plaintiffs-appellants, Fifth Third Bank and Sharon Shelton, appeal a summary judgment granted in favor of defendants-appellees, the estate of James L. Gross Sr., James L. Gross Jr., the Gross Partnership, William Landis & Landis Engineering, Inc., the city of Carlisle, and Matthew Coppler, with respect to appellants' claims against appellees, arising from the allegedly faulty construction of the foundation for Shelton's house.

{¶ 2} In the mid–1970s, James L. Gross Sr., and his son, James L. Gross Jr., formed the Gross Partnership to engage in, among other things, real estate development. In the late 1970s, the Gross Partnership purchased a 28–acre tract in Carlisle, Ohio, to develop approximately 65 residential lots, which became known as Bakersfield First Addition. The Gross Partnership was aware that the tract had been previously used as a dump by a local roofing company; consequently, they hired an engineering firm to evaluate the land's suitability for residential construction. The engineering firm sublet a geotechnical study of the tract to the H.C. Nutting Company. Nutting's investigation revealed that there was fill throughout the tract, extending to a depth of 14 feet, which consisted primarily of roofing material that had been dressed over with other fill materials. In light of these conditions, Nutting recommended that certain safeguards be taken to safely support the construction of the proposed residential structures on the land, including the use of drilled piers and the removal of the roofing-material

debris. Nutting "judge[d] that the roofing material would actually support [a] floor slab." However, it "suggest[ed] that an examination be made upon initial excavation to determine just how these materials have been placed; i.e., whether they are rolls of roofing material, shingles or sheets placed on top of each other." Nutting further found that "[t]here appears to have been no deterioration of the [roofing] materials based upon visual examination." Nutting summarized the results of its investigation and its recommendations in a document dated June 21, 1979, which later became known as the Nutting Report.

{¶ 3} After reviewing the Nutting Report, the Gross Partnership concluded that if Nutting's recommendations were followed, then the lots "would apparently be buildable." They decided to give a copy of the Nutting Report to anyone who bought one of the lots in Bakersfield First Addition. They also discounted the price of the lots by approximately $2,000 to cover the anticipated extra costs that builders would incur as a result of following the recommendations in the Nutting Report. They disclosed the Nutting Report's existence by listing it as a restrictive covenant on the development plat of Bakersfield First Addition, which was filed in the Warren County Recorder's Office in 1979.

{¶ 4} Sometime in the early 1990s, the Gross Partnership sold four lots in Bakersfield First Addition to Darrell Cope, a builder, providing him with a copy of the Nutting Report. In April 1993, Cope contracted with Sharon Shelton to build a house for her on one of the four lots, namely, Lot No. 33. At the time Shelton entered into the contract, she contacted Gross Jr., who had been her seventh-grade teacher, for a reference on Cope. Gross Jr. told her that "he had been working with Mr. Cope for a while and so far he had no complaints and had not heard any."

{¶ 5} Cope drew up plans for Shelton's house that included a slab foundation. In May 1993, he poured the foundation for Shelton's house. Cope's work on the foundation was inspected by William Landis, an engineer, who was under contract with Carlisle to perform engineering services for the city, and who was acting as Carlisle's building inspector. Landis ordered Cope to add some reinforcement bars to the concrete; he then approved Cope's foundation for Shelton's house.

{¶ 6} In June 1993, while Cope was digging the foundation to the house on Lot No. 32, which was next door to Shelton's, Landis observed reinforcing rods sticking out of the soil there. As a result, Landis ordered Cope to dig a four-foot test hole to further investigate the lot's soil conditions. When Cope dug the test hole, he found roofing-material debris. Landis ordered Cope to dig further until he reached undisturbed material. Cope dug down an additional ten feet before he found undisturbed earth. On June 11, 1993, Landis met with Carlisle's city manager, Matthew Coppler, at Lot No. 32 and showed him the debris; Landis expressed his concern that the house on that lot was being built over a "major

landfill." Landis's primary concern was that the debris posed a safety problem with respect to the area's groundwater; consequently he requested that Coppler place a stop-work order on the house being constructed on Lot No. 32 to further investigate the situation. Landis also requested that a stop-work order be placed on Shelton's house, since it was immediately adjacent to Lot No. 33. Coppler did not respond to Landis's request for a stop-work order. Nevertheless, before leaving the site, Landis told Cope that if the hole he had dug on Lot No. 32 "was filled with compacted gravel," then he "would approve a building on that site[,] assuming that * * * the water was not a continuing problem." Cope agreed to take out the roofing-material debris on Lot No. 32 and to replace it with compacted gravel, to ensure the structural integrity of the house built on the lot. Coppler also agreed to that solution.

{¶ 7} Four days later, Landis received a copy of the Nutting Report from Coppler. After glancing at the report, Landis again asked Coppler to approve a stop-work order on Lots No. 32 and 33 because of his concerns that the roofing-material debris posed a potential safety hazard with respect to both the underground water and the structural integrity of the foundations of the houses that were being built on those lots. Coppler told Landis that he was not going to address the water problem because it was the "county health department's problem," not the city's. He then told Landis "to go ahead with the inspections."

{¶ 8} Landis did not recommend to Coppler that "it would be advisable to dig out the foundation area around [Lot No.] 33" because he "didn't have enough information to make any kind of recommendation." Landis also did not order Cope to perform the same remedial measures on Shelton's Lot No. 33 that he had suggested for Lot No. 32, i.e., to remove the roofing-material debris and replace it with compacted gravel, because Shelton's house had already been built on the lot and it would have had to have been torn down to fix the potential problems with the foundation. Nevertheless, Landis made notes of his conversations with Coppler to make a record of his concerns about the groundwater and the foundations in case "problems did arise," and to make a record showing that he proceeded as he did only because Coppler ordered him to do so. Landis continued to study the Nutting Report, "looking for leverage" to change Coppler's decision not to grant a stop-work order, with Landis's primary concern still being the safety of the groundwater. Landis even ordered groundwater testing at his own expense. Prior to final inspection of Shelton's residence, Landis reminded Coppler of the "potential serious nature of the groundwater problem." He provided Coppler with a copy of his report on the groundwater to which he attached a note, stating he "still had concerns." Coppler never responded to Landis's note.

{¶ 9} On August 31, 1993, Landis issued an occupancy permit for Shelton's house on Lot No. 33. On September 1, 1993, Shelton closed with Fifth Third

Bank on her mortgage loan for her new residence. Within a year after she had moved into her new house, Shelton noticed "nail poppings" in the ceilings, living room, kitchen, and hallways. She literally saw one or two nails fall to the ground. She notified Cope of this problem, and he sent someone out to fix them. In the spring of 1996, Shelton again noticed nail poppings in the ceilings, living room, and hallways of her house and also noticed nail poppings appear for the first time in her bedrooms. She saw four or five nails fall to the ground at that time. She also noticed some separation between the walls and her ceilings. She again notified Cope of these problems, but this time he told her there was "nothing he could do" because the house was outside its one-year warranty. At this point, Shelton became angry with Cope, and their conversation became "very heated." She told him that she thought he was responsible, since he had repaired them previously, and that the problems were occurring in "the exact same spots so something had to be not right." After Cope refused to fix the problem, Shelton hired someone to fix the holes and repaint the entire house.

{¶ 10} In late 1998 or early 1999, Shelton noticed "[t]hose same nail poppings, wall separations," and "lots of things." It was at this time that she noticed that the house "really started falling apart." In the late summer or fall of 1999, Shelton contacted her insurance company, seeking coverage under her home-owner's policy; the insurer denied coverage after telling her that her house was "literally sinking into the ground." In late 1999, Shelton noticed that the floor in her living room was "sloping down." She called John Evans, the real estate agent who had helped her find the house, to look at her residence; when he arrived, he took one step in the front door and said, "Oh my gosh." After Shelton showed Evans the remainder of her house, he "agreed that there was a major problem." He then called Gross on his cell phone and told him, "You have to see this to believe it." Gross never came to Shelton's house, and she never heard from Evans again. In late 1999 or early 2000, when the condition of her house "got really, really bad," Shelton notified Fifth Third Bank of her problems with the house and told them that she would no longer be making payments on her house; Shelton made her last payment to Fifth Third in December 1999. In March 2000, Shelton received a copy of the Nutting Report for the first time. After reading it, she "started calling attorneys." Shelton moved out of the house in May 2000, because she became afraid and because the city ordered her to move out of the house. Shelton's house was later condemned by the city in August 2000.

{¶ 11} On April 18, 2002, Shelton and Fifth Third Bank ("appellants") filed a complaint against Cope and Gross Sr.,[1] as well as against Landis and his

---

1. Gross Sr. died while this matter was pending in the trial court; upon learning of his death, appellants substituted the executor of his estate as a defendant.

company, Landis Engineering, Inc. (together, "Landis"), alleging, among other things, breach of contract and negligence. On July 18, 2002, Landis brought a third-party complaint, seeking indemnification, defense and reimbursement of costs from the city of Carlisle. On December 17, 2002, appellants filed an amended complaint, naming as additional defendants Gross Jr., the Gross Partnership, Coppler, and Carlisle and alleging breach of contract, breach of the implied warranty of workmanlike construction, breach of contract as an intended third-party beneficiary, negligence, willful, wanton, and reckless misconduct, fraudulent misrepresentation, and violation of Shelton's civil rights, pursuant to Section 1983 et seq., Title 42, U.S.Code. All of the named defendants except Cope moved for summary judgment.

{¶ 12} On December 31, 2003, the trial court issued a decision granting summary judgment in favor of all defendants except Cope. The trial court found that the estate of Gross Sr., Gross Jr., and the Gross Partnership (collectively, "the Gross appellees") did not owe any duties to Shelton regarding the lot they sold to Cope, which she had subsequently purchased. The trial court also found that Shelton was not an intended third-party beneficiary of the contract between the Gross appellees and Cope, or the contract between Landis and Carlisle that called for Landis to perform building-inspection services for Carlisle. The trial court also found that appellants could not prove their fraudulent-misrepresentation claims against either the Gross appellees or Landis. The trial court further found that there was no evidence that Coppler or the city had acted in "a wanton or reckless manner such as to negate the statutory grant of immunity," to which it found they were entitled. Finally, the trial court found that the applicable statute of limitations for all of appellants' claims against the Gross appellees, Landis, Coppler, and Carlisle had expired. On May 3, 2004, the trial court entered a judgment formally granting summary judgment to the Gross appellees, Landis, Coppler, and Carlisle as to appellants' claims against them.[2]

{¶ 13} Appellants now appeal from the trial court's May 3, 2004 judgment entry, assigning the following as error:

{¶ 14} Assignment of Error No. 1:

{¶ 15} "The trial court erred to the prejudice of plaintiffs/appellants by granting summary judgment on all claims."

{¶ 16} Appellants assert in their sole assignment of error that the trial court erred by granting summary judgment against them on all of their claims against

---

2. The trial also noted in its judgment entry that pursuant to agreement of the parties, Landis's third-party claims against Carlisle for reimbursement of costs and attorney fees he incurred through the date of the entry had been dismissed with prejudice and that his claims for any costs that he might incur in the future had been dismissed without prejudice to refilling.

appellees, raising seven arguments in support. For the reasons that follow we conclude that the trial court did not err in granting summary judgment to appellees.

{¶ 17} Our standard of review with respect to a summary judgment is de novo; we review the trial court's judgment independently and without deference to its determination. *Burgess v. Tackas* (1998), 125 Ohio App.3d 294, 296, 708 N.E.2d 285. A trial court may grant summary judgment to the moving party only where it appears that no genuine issue of material fact remains to be litigated, that the moving party is entitled to judgment as a matter of law, and that it appears from the evidence that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, with that party being entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 18} In their first argument, appellants contend that the trial court erred in granting summary judgment to appellees on the basis that appellants filed their claims outside of the applicable statute of limitations. We will discuss the claims that appellants raise in this argument as it becomes necessary when we address their remaining six arguments.

{¶ 19} In their second argument, appellants assert that the trial court erred in granting appellees summary judgment on appellants' third-party-beneficiary claims, because they presented evidence from which a reasonable jury could have found that Shelton was an intended third-party beneficiary of the contract between the Gross appellees and Cope, and the one between Landis and Carlisle. We disagree with this argument.

{¶ 20} A third person for whose benefit a contract has been made by another may maintain an action on that contract provided that the contract shows that the contracting parties intended to benefit the third party. *Grant Thornton v. Windsor House, Inc.* (1991), 57 Ohio St.3d 158, 161, 566 N.E.2d 1220. However, a mere incidental or indirect benefit to the third party is insufficient to confer upon him the right to maintain an action on the contract. Id.

{¶ 21} Here, it is apparent from the evidence presented that Shelton was, at best, an incidental, rather than intended, beneficiary of the contract between the Gross appellees and Cope. Appellants assert that "[t]here is substantial evidence from which a jury could find that [the Gross appellees] intended individual homeowners to benefit from purchasing properly constructed homes on [their] lots." However, there was no evidence presented that the contract between the Gross appellees and Cope obligated Cope to properly construct houses on the lots for the Gross appellees' benefit or, for that matter, anyone

else's benefit besides Cope's. While Gross Jr. testified that he *expected* all builders to whom he sold lots to build houses on the lots that were "safe and in compliance with [Carlisle's] building code," that expectation does not demonstrate that Cope was contractually obligated to the Gross appellees to do so. In fact, it does not appear from the record that either the Gross appellees or Cope breached the terms of their contract regarding the sale of the four lots. Therefore, appellants have no basis for claiming an intended third-party beneficiary of the contract between those two parties.

{¶ 22} Appellants also failed to establish a genuine issue of material fact as to whether Shelton was an intended beneficiary of Landis's contract with Carlisle, obligating Landis to provide building-inspection services to the city. Individuals are not considered third-party beneficiaries of contracts between political subdivisions and service providers unless the contract is made and entered into with the intent to benefit the third party. *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 436, 674 N.E.2d 731. "Generally, private citizens do not have the right to enforce governmental contracts on their own behalf, unless a different intention is clearly manifested." Id.

{¶ 23} Here, appellants have failed to show that Landis contracted with Carlisle with the intention of benefiting Shelton or that there was "a clearly manifested intention on behalf of the contracting parties to give appellant[s] a private right to enforce the contract." Id. The contractual relationship between Landis and Carlisle that obligated Landis to provide the city with building-inspection services required Landis to provide those services "to the community at large," id., and not to any specific individuals like Shelton. While Shelton may have benefited from this contract, any benefit to her was merely incidental. Therefore, appellants were not permitted to enforce the contract between Landis and Carlisle under a theory that Shelton was an intended third-party beneficiary of their contract. Id.

{¶ 24} In their third argument, appellants assert that the trial court erred by granting summary judgment against them on their fraudulent-misrepresentation claims against the Gross appellees and Landis. We disagree with this argument.

{¶ 25} In order to prevail on their fraudulent-misrepresentation claim, appellants were obligated to establish all of the following elements: "(1) a representation, or where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such other disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance." *Cardi v. Gump*

(1997), 121 Ohio App.3d 16, 22, 698 N.E.2d 1018. " '[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence" between them." ' " *State v. Warner* (1990), 55 Ohio St.3d 31, 54, 564 N.E.2d 18, quoting *Chiarella v. United States* (1980), 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348, quoting Restatement of the Law 2d, Torts (1976), Section 551(2)(a).

{¶ 26} Here, there was no evidence that either the Gross appellees or Landis made a fraudulent misrepresentation to Shelton about the conditions of the land on which her house was built, since appellees did not know that Shelton was buying the house to be constructed on Lot No. 33. Furthermore, since the Gross appellees and Landis were unaware that Shelton was purchasing Lot No. 33, they were in no position to disclose to her any material facts regarding the conditions of Lot No. 33, assuming that they would have had a duty to disclose those facts to her had they known her identity. Appellants argue that Landis's "doing nothing to identify and warn Shelton" about the conditions of her house "constituted fraudulent concealment." They further suggest that this same argument applies with equal force to Carlisle and Coppler. However, appellants have not cited any authority in support of their contention that Landis, Carlisle, or Coppler had a duty to identify the person or persons who were going to purchase Lot No. 33 and to warn them about the risks associated with the land, nor are we aware of any. Furthermore, there was no evidence of a fiduciary or other similar relationship of trust and confidence between Shelton and the Gross appellees, Landis, Carlisle, or Coppler that would have imposed a duty upon them to disclose to Shelton the underlying defects of Lot No. 33. See *Warner*, 55 Ohio St.3d at 54, 564 N.E.2d 18.

{¶ 27} In their fourth argument, appellants contend that the trial court erred in finding that the Gross appellees owed no tort duties to Shelton. They contend that the Gross appellees had a duty to Shelton "to bring competent contractors to the development." However, appellants' argument misstates the role that the Gross appellees played in this situation. The Gross appellees did not hire Cope as a contractor to build houses on their lots in Bakersfield First Addition, so that the Gross appellees could then sell the completed houses to persons like Shelton. Instead, they sold four of their lots in Bakersfield First Addition to Cope, who, in turn, built houses on them and sold them to persons like Shelton. The Gross appellees divulged the inherent defects in the land to the builders or other persons who purchased it, and even discounted its price to compensate the buyer for the anticipated costs he could incur as a result of following the recommendations of the Nutting Report. Any responsibilities that

the Gross appellees had with respect to those lots ended when they sold them to Cope, with full disclosure of the land's inherent defects. As one court has noted, "outside an agreement or law establishing a relationship to the contrary, the prior owners of a property are divested of all rights and obligations to the said property on the date the title to the property is transferred to the new owners." *Steele v. McNatt* (1995), 102 Ohio App.3d 558, 562, 657 N.E.2d 575.

{¶ 28} Appellants further argue that the Gross appellees had a duty to disclose to Shelton that her house was being constructed on a landfill; however, we reject this argument for the same reason we rejected it earlier, i.e., there was no fiduciary or other similar relationship of trust and confidence between them. See *Warner*, 55 Ohio St.3d at 53, 564 N.E.2d 18. In light of our finding that the Gross appellees owed no duties to Shelton and our previous findings that Shelton was not an intended third-party beneficiary of the contract between the Gross appellees 'and Cope and that the Gross appellees were not liable to appellants on a theory of fraudulent misrepresentation, we conclude that the trial court properly granted summary judgment to the Gross appellees on all of the claims appellants brought against them. Thus, we need not decide whether appellants brought their claims against the Gross appellees in a timely manner.

{¶ 29} In their fifth argument, appellants assert that the trial court erred in determining that Landis owed no duty to Shelton when inspecting the construction of her house for Carlisle. They contend that Landis owed Shelton a duty under the assumed-duty rule. In support, they argue that Landis assumed a duty to protect the inhabitants of the houses built on Lots No. 32 and 33 when he "exceeded his duties as Carlisle's building inspector after Coppler denied a stop work order by continuing to 'look for leverage' to convince Coppler to reverse his position." They also assert that Landis "failed to perform this assumed duty with due care," because when Coppler "stonewalled" him, he "could have walked off the job," or "taken his concerns up the ladder at City Hall." We disagree with this argument.

{¶ 30} Restatement of the Law 2d, Torts (1965) 135, Section 323, states:

{¶ 31} "Negligent Performance of Undertaking to Render Services

{¶ 32} "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

{¶ 33} "(a) his failure to exercise such care increases the risk of such harm, or

{¶ 34} "(b) the harm is suffered because of the other's reliance upon the undertaking."

{¶ 35} " '[Section] 323(a) applies only when the defendant's actions increased the risk of harm to the plaintiff relative to the risk that would have existed had the defendant never provided the services initially. Put another way, the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun the performance.' " *Wissel v. Ohio High School Athletic Assn.* (1992), 78 Ohio App.3d 529, 540, 605 N.E.2d 458, quoting *Patentas v. United States* (C.A.3, 1982), 687 F.2d 707, 716.

{¶ 36} Here, Landis's allegedly negligent performance of the duty that he allegedly assumed on behalf of Shelton, i.e., "to look for leverage" to convince Coppler to reverse his decision to deny Landis's request for a stop-work order, did not place Shelton in a worse situation than if Landis had never begun performance of the assumed duty. *Wissel,* 78 Ohio App.3d at 540, 605 N.E.2d 458. Therefore, appellants cannot prevail on their claim that Landis assumed a duty to Shelton and should be held liable for breach of that duty. In light of this finding and our previous findings that Shelton was not a third-party beneficiary of the contract between Landis and Carlisle and that Landis made no fraudulent misrepresentation to Shelton, we conclude that the trial court properly awarded summary judgment to Landis and Landis Engineering on appellants' claims against them. As a result, we need not consider whether the trial court was correct in finding that appellants' claims against Landis and Landis Engineering were not brought within the time allowed by the applicable statute of limitations.

{¶ 37} In their sixth argument, appellants assert that Carlisle and Coppler are not entitled to sovereign immunity as a matter of law because reasonable minds could differ as to the evidence presented on whether Coppler acted in a reckless or wanton manner in refusing Landis's request for a stop-work order, as set forth in R.C. 2744.03(A)(6)(b). However, we need not address this argument, because we conclude that appellants failed to bring their claims against Coppler and Carlisle in a timely manner.

{¶ 38} Initially, appellants claim that the four-year statute of limitations period in R.C. 2305.09 applies, since this is a case involving alleged damage to real property. We disagree with this argument. Generally, where a special statute of limitations applies to an action, it prevails over an arguably applicable general statute of limitations. *Abdalla v. Olexia* (1996), 113 Ohio App.3d 756, 759, 682 N.E.2d 18. Here, appellants' claims against Coppler and Carlisle stem from Coppler's actions while he was acting as Carlisle's city manager; thus, the applicable statute of limitations that applies to appellants' action against Coppler and Carlisle is R.C. 2744.04(A). Id. That provision states:

{¶ 39} "An action against a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function * * * shall be brought within two years after the cause of action arose * * *."

{¶ 40} The trial court determined that appellants' cause of action accrued in 1996 when they noticed the nail poppings for the second time, or at the latest, in December 1998, when Shelton's insurer told her that her house was sinking into the ground. However, even if the trial court erred in determining that Shelton's cause of action accrued in December 1998, we conclude that appellant's cause of action accrued no later than 1999 or early 2000, when Shelton noticed that her floor began to slope and that the condition of her house was getting "really, really bad." In fact, Shelton herself acknowledged that by March 2000, she knew it was time to start contacting attorneys. Yet appellants did not bring their action against Cope, the Gross appellees, and Landis until April 2002 and did not file suit against Coppler and Carlisle until December 2002. Under these circumstances, we conclude that appellants' action against Coppler and Carlisle were untimely.

{¶ 41} Appellants argue that the two-year period to bring an action against Carlisle and Coppler should not be deemed to have commenced until October 2002, when they first learned through discovery that Coppler had recklessly denied Landis's request for a stop-work order. They argue that until they learned that information, they did not have sufficient evidence to overcome Coppler's and Carlisle's sovereign-immunity defense. In support of their argument, they rely primarily on *Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 2002-Ohio-2007, 766 N.E.2d 977, wherein the court held that "[a] cause of action based upon an employer intentional tort accrues when the employee discovers, or by the exercise of reasonable diligence should have discovered, the workplace injury and the wrongful conduct of the employer." Appellants argue that they could not have discovered that the damage done to Shelton's house was due to the city's and Coppler's wrongful conduct until October 2002, when they learned during discovery about Coppler's denial of Landis's request for a stop-work order. However, the *Norgard* court was careful to emphasize that "the discovery rule must be specially tailored to the particular context to which it is to be applied." Id.

{¶ 42} In this case, Shelton knew by late 1999 or early 2000 that something was seriously wrong with the foundation of her house. Since her house was only about six years old at that time, it should have been apparent to any reasonable person that the builder (Cope) and anyone responsible for inspecting the builder's work, including Carlisle and Coppler (along with acting

building inspector Landis), were responsible for the damage.[3] However, appellants did not file their action against Carlisle and Coppler until December 2002— well after the two-year statute of limitations had expired. Therefore, we conclude that the trial court did not err in dismissing appellants' action against Carlisle and Coppler on the grounds that it was filed outside of the applicable statute of limitations.

{¶ 43} In their final argument, appellants assert that the trial court erred in granting Carlisle and Coppler summary judgment on their Section 1983 claim, arising from their allegation that "Copper subverted Landis' authority to properly perform his functions as building inspector" on an "arbitrary and irrational basis," which resulted in the "deprivation of Shelton's property rights through a condemnation which would have never occurred but for Coppler's wrongful conduct." However, the statute of limitations for Section 1983 claims requires that they be filed within two years from the date of their accrual. *Browning v. Pendleton* (C.A.6, 1989), 869 F.2d 989, 992. Here, we conclude that appellants' Section 1983 claim accrued in late 1999 or early 2000 for the same reasons that appellants' action against Carlisle and Coppler accrued at that time. Because appellants did not file their Section 1983 claim until December 2002, their claim was barred by the statute of limitations.

Judgment affirmed.

POWELL, P.J., and BRESSLER, J., concur.

---

3. Shelton had at least constructive notice of the Nutting Report at the time of her purchase of the lot by virtue of the fact that it had been listed as a restrictive covenant on the development plat. The owner of a lot is chargeable with any provision, including a restrictive covenant, that is disclosed by any instrument that is part of his or her chain of title. *Hanley v. Esposito* (1928), 7 Ohio Law Abs. 261, 262, 1928 WL 2682. Thus, Shelton had constructive notice at the time of her initial purchase of the land's inherent defects. Once it had become clear in late 1999 or early 2000 that the house's foundation was failing, she should have begun an investigation to see what party or parties were responsible. Her failure to do so was unreasonable under the circumstances.