OPINION
{¶ 1} Plaintiff-appellant Mark Gessner appeals from a summary judgment rendered in favor of defendants-appellees Alan Schroeder, Roger Pittman, and Donald Carter. At the time of the events involved in this litigation, Schroeder, Pittman, and Carter were employed as police officers for the City of Dayton, Ohio. The claims against the officers arose from Gessner's arrest for disorderly conduct, felony assault, and resisting arrest.
 {¶ 2} Gessner contends that the trial court erred in finding that there were no genuine issues of material fact and that the officers were entitled to judgment, as a matter of law, on Gessner's claims under Section 1983, Title 42, U.S. Code. Gessner also contends that the trial court erred in finding that Gessner was arrested for disorderly conduct and obstructing official business.
 {¶ 3} We conclude that the trial court correctly rendered summary judgment in favor of Pittman and Carter, because the claims against them are barred by the statute of limitations. However, there are genuine issues of material fact precluding summary judgment in Schroeder's favor. Accordingly, that part of the judgment of the trial court rendered in favor of Pittman and Carter is Affirmed, that part of the judgment rendered in favor of Schroeder is Reversed, and this cause is Remanded for further proceedings.
 I {¶ 4} In mid-November, 2001, Dayton police officers were dispatched at 5:52 p.m. to 199 Cross Street, in Dayton, Ohio, in response to a "disturbance with shots fired." At least two neighborhood residents had made 911 calls to the police about this incident. One call was made by Timothy Petry, who lived on Cross Street. After hearing shots, Petry called 911 and described two individuals, Ladonna Mercer and Joseph Evans, and the clothing they were wearing. Petry did not know if Mercer and Evans were involved with the shooting, but he knew they had come out of the building where the shooting occurred. Petry was told that the police were already on their way.
 {¶ 5} Officer Roger Pitman was the first to arrive on the scene, and Officer Alan Schroeder arrived next. The officers stopped Mercer and Evans and began questioning them. At that point, Petry was also standing with the officers, who were in front of 122 Cross Street.
 {¶ 6} Plaintiff-appellant Mark Gessner lived nearby, with his girlfriend, Marla Rhodes. Gessner and Marla were just sitting down to dinner when they heard gunshots. Gessner went to his back door and saw Ray, the owner of the apartment building next door, standing in the back yard of the apartment building. Ray had a gun in his hand, and his arm was dropped down, as if he had just fired a weapon. Ray was yelling at another man, Dierre, and said he would kill Dierre if he came back.
 {¶ 7} At that point, Dierre ran onto Gessner's property and said that his boss was shooting at him because the boss thought Dierre was "messing with" his girlfriend. Dierre asked if he could stand on the back porch while Gessner called the police. Gessner then called 911 and said that he had heard a gun go off. Gessner told the dispatcher that the man who had been shot at was standing on his back porch. Gessner asked for the police to come to his house.
 {¶ 8} The police never came to Gessner's house in response to the 911 call. Marla subsequently looked out the front door and saw that the police had gone down Cross Street. As a result, Gessner went down the street to get the police. When Gessner arrived at 122 Cross Street, he saw two police officers (Pittman and Schroeder) and three civilians (Petry, Evans, and Mercer). Evans had been visiting his girlfriend (Mercer) at her apartment, when Mercer's landlord found a man hiding in the building and discharged his weapon. This is consistent with Gessner's account, and indicates that the shooter was the landlord or apartment owner, Ray, not Evans or Mercer.
 {¶ 9} The accounts differ about what happened after Gessner arrived. Pittman and Schroeder signed virtually identical affidavits, stating that while they were questioning Evans and Mercer, Gessner came from the yard across the street and immediately began yelling, "There's someone in this backyard that was shot at." Pittman acknowledged Gessner and told him to wait where he was, because Pittman was still questioning individuals. Gessner then became very upset and began yelling at Pittman and Schroeder, using profanity. The officers state that they tried to calm Gessner down, but Gessner continued to yell profanity and became louder, using more profanity. Gessner then got in Schroeder's face and increased his "abusive, profane yelling," and his conduct escalated to the point where he was causing a disturbance in the street and interfering with the officers' investigation of the incident.
 {¶ 10} After being told three times to "cease and desist," Gessner continued yelling, so Officer Schroeder finally told Gessner to "stop it." When Gessner continued to yell, Schroeder grabbed him by the arm and told Gessner he was under arrest. Gessner attempted to pull his arm and spin away, so Schroeder tightened his grip. Gessner then struck Schroeder in the side. As Gessner continued to struggle, both officers forced him over to the cruiser, handcuffed him, and placed him in the back of the cruiser. The officers indicated that they were not able to complete their investigation of the shots fired incident due to Gessner's conduct and arrest. Gessner was arrested for disorderly conduct, resisting arrest, and felony assault, and was held overnight in jail. The charges were dismissed the following day.
 {¶ 11} Gessner's account differs substantially. Gessner testified that he approached the group and saw that Officer Schroeder was standing around, not doing anything. Gessner made a hand gesture for Schroeder to come to him, as he did not want to intrude on Officer Pittman's conversation. Because Schroeder looked at Gessner, but did not do anything, Gessner then approached the officers. Gessner told Schroeder his name, where he lived, and that he had called 911. Gessner also said that the man who had been shot at was in his yard. Gessner asked if the police could come over and get the man. Although Schroeder was not doing anything, Schroeder told Gessner to hold on, because he was busy. When Gessner persisted in asking for help, Schroeder told him to cease and desist. Gessner was concerned because his girlfriend was home alone with a stranger who was involved in the shooting. Accordingly, Gessner pointed to his home and said that he needed the police to come get the man, and that he needed police services and protection.
 {¶ 12} Schroeder told Gessner again to cease and desist. After Schroeder said "cease and desist" a third time, Gessner decided that if the police were not going to go protect his home, he would. Gessner said, "Fuck this," and started to walk home. At that point, Schroeder grabbed Gessner and pinched him very hard in the biceps. Gessner jerked his arm away because of the pain, but Schroeder held on to his arm. Schroeder then started pushing Gessner toward the cruiser.
 {¶ 13} Excerpts from Gessner's deposition, which the defendants submitted to the trial court, do not reveal in any detail what happened after Gessner was pushed toward the cruiser. Gessner's affidavit is generally consistent with the deposition excerpts, and further indicates that Schroeder forced Gessner's upper body down on the hood of the cruiser. Gessner also stated that he was bruised on the arms, and that his watch was torn off.
 {¶ 14} Certain observations of witnesses corroborate Gessner's account. For example, Timothy Petry stated in his deposition that Gessner first attempted to get the officers' attention with a hand gesture, and then tried verbally. This contradicts the statements in the officers' affidavits. Petry said that Gessner's attitude was not bad when he approached the police, and that Gessner was just trying to get their attention.
 {¶ 15} In his deposition, Petry also said that he did not hear Gessner yell, nor did he hear Gessner use profanity. Petry said he did not tell the police that Gessner interfered with the investigation and did not tell the police that he heard Gessner swear. In response to questions from the City's attorney, Petry said he was not sure why Officer Schroeder was telling Gessner to cease and desist. Petry denied telling the police that Gessner was out of control. He stated that Gessner did not physically threaten anyone, he was just verbal.
 {¶ 16} Petry heard Gessner telling the police that he was there because someone was on his back porch that had been involved in the shooting. Petry also heard Gessner tell the police that Marla Rhodes was home by herself with this individual and that he wanted the police to come and get the man. Additionally, Petry said he did not see Gessner strike any officers at the scene. Finally, Petry stated that Schroeder threw Gessner forcefully onto the hood of the police cruiser.
 {¶ 17} Joseph Evans was one of the individuals who was seen coming out of the building where the shots were fired. Evans signed an affidavit that favored the officers, and subsequently signed an affidavit that favored Gessner. The trial court refused to consider the content of the second affidavit because it lacked a seal or stamp of the notary public who had witnessed Evans's signature. However, the trial court apparently did not read Evans's deposition, which was taken later in the same day that the affidavit was signed. During the deposition, Evans identified the affidavit, and the affidavit was marked as "Plaintiff s Exhibit 7." Evans verified during the deposition that he had signed the affidavit that day (October 26, 2005), in the presence of a notary public.
 {¶ 18} During the deposition, the defendants' attorney questioned Evans at length on the content of the affidavit, and about some aspects of the affidavit that contradicted the prior affidavit Evans had signed. Accordingly, the affidavit was properly verified and the trial court had no reason to refuse to consider it.
 {¶ 19} Evans testified during the deposition that he did not recall Gessner using profanity on the day of the incident. Evans recalled Gessner getting loud after he was ignored by the officers when Gessner wanted something done because he had a strange man in his backyard. According to Evans, Gessner wanted something done because he thought the man was the cause of all that had happened. However, the officers were just ignoring Gessner, telling him to be quiet.
 {¶ 20} Evans also testified that he did not hear Gessner "cuss," scream, or yell, and did not hear him call the police any names. Evans did not see Gessner fighting or arguing with anyone; Gessner was just trying to get some help.
 {¶ 21} Admittedly, there were some conflicts between affidavits and depositions. As we mentioned, Evans signed two affidavits. In the second affidavit, Evans said that he had not read certain parts of the prior affidavit that he had signed for the City. However, Evans indicated during his deposition that this paragraph in the second affidavit was incorrect, and that he had, indeed, read the first affidavit. This conflict is irrelevant, because the trial court refused to consider the second affidavit. If the conflict were relevant, it would be in the context of credibility issues, which should be weighed at trial.
 {¶ 22} Furthermore, there were also conflicts between Officer Schroeder's affidavit and his subsequent deposition testimony. For example, Schroeder stated in his affidavit that Gessner began yelling immediately when he came on the scene. Schroder stated to the contrary in his deposition, indicating that he first saw Gessner standing on the sidewalk, and that Gessner made a hand gesture to get his attention. As is appropriate for purposes of summary judgment, we have construed the facts in Gessner's favor.
 {¶ 23} After reviewing the evidence, the trial court concluded that Gessner's Section 1983 claim was without merit, because a reasonable officer could have believed that probable cause existed to arrest Gessner for both disorderly conduct and obstructing official business. The trial court based its decision on the fact that Gessner approached officers who were in the midst of an investigation, continued to talk despite being told three times to cease and desist, and stated "Fuck this." The trial court also found that Gessner's claims against Pittman and Carter were barred by the statute of limitations. Accordingly, the trial court rendered summary judgment in favor of Schroeder, Pittman, and Carter. From the summary judgment rendered against him, Gessner appeals.
 II {¶ 24} Gessner's First Assignment of Error (quoted verbatim) is as follows:
 {¶ 25} "WHETHER OR NOT THE TRIAL COURT MADE [SIC] ERROR RULING THAT PLAINTIFF DID NOT HAVE MATERIAL ISSUE OF FACT."
 {¶ 26} Gessner is a pro se litigant, and his brief does not strictly comply with the requirements of the Ohio Appellate Rules. Nonetheless, what Gessner appears to be saying in his First Assignment of Error is that genuine issues of material fact exist concerning the Section 1983 claim against Schroeder. We agree.
 {¶ 27} "A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. FiveRivers MetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court. Broadnax v. Greene CreditService (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167, and Long v.Tokai Bank of California (1996), 114 Ohio App.3d 116, 119,682 N.E.2d 1052.
 {¶ 28} Gessner's claims are brought under Section 1983, Title 42, U.S. Code, which provides that:
 {¶ 29} "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *."
 {¶ 30} Two elements are required to establish 1983 claims against individual public officials: "(1 ) the conduct complained of must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of a federally protected right, either constitutional or statutory." Cook v. Cincinnati (1995),103 Ohio App.3d 80, 85, 658 N.E.2d 814 (citations omitted).
{¶ 31} Warrantless arrests made without probable cause violate the Fourth Amendment and may provide the predicate for Section 1983 claims. Mayes v. Columbus (1995),105 Ohio App.3d 728, 742, 664 N.E.2d 1340, citing Marx v. Gumbinner
(C.A.11, 1990), 905 F.2d 1503, 1505. Probable cause for purposes of the Fourth Amendment has been defined to require " `facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Mayes, 105 Ohio App.3d at 742-43, quoting fromMichigan v. DeFillippo (1979), 443 U.S. 31, 37, 99 S.Ct. 2627, 2632,61 L.Ed.2d 343. Generally, "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." Gardenhire v. Schubert (C.A. 6, 2000),205 F.3d 303, 315, quoting from Pyles v. Raisor (C.A. 1995), 60 F.3d 1211, 1215.
 {¶ 32} In Section 1983 actions, government officials performing discretionary functions are shielded by an affirmative defense of qualified, or good-faith immunity, where their conduct " `does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.'" Gardenhire,205 F.3d at 310-311 (citation omitted). If a defendant moves for summary judgment based on qualified immunity:
 {¶ 33} "[T]he plaintiff must first identify a clearly established right alleged to have been violated and second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right. * * * The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. * * * The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." Id. at 311 (citations omitted).
 {¶ 34} In Gardenhire, the Sixth Circuit Court of Appeals stressed that officials may be held personally liable if their actions are not "objectively reasonable in light of legal rules that were `clearly established' at the time" the actions were taken. Id. "This `objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." Id., citing Graham v. Connor (1989),490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443. After viewing the facts in a light most favorable to Gessner, we conclude that there are genuine issues of material fact on the issue of whether Officer Schroeder's conduct was objectively reasonable in light of clearly established rules for warrantless arrests.
 {¶ 35} In considering whether Schroeder had probable cause to believe Gessner had committed or was about to commit an offense, the trial court relied on the elements of disorderly conduct set forth in R.C.2917.11(A)(2) and the elements of obstruction of official business outlined in 2921.31(A). The court's choice of these crimes was based on its stated belief that Gessner had been arrested for disorderly conduct and obstructing official business. As Gessner points out, this was incorrect.
 {¶ 36} The City did not file any official documents indicating the actual charges that were made against Gessner, nor do the affidavits of Officers Schroeder and Pittman reveal the particular crimes for which Gessner was arrested. Gessner stated in his verified complaint that he was charged with disorderly conduct, resisting arrest, and felony assault against Schroeder, and that the charges were dismissed the next day. Complaint, at ?| 7 and 9. Gessner made the same statements in an affidavit that was filed in response to the City's summary judgment motion. Gessner's account is supported by Sergeant Carter's affidavit. Therein, Carter says he was told by the arresting officers that the charges were disorderly conduct and assault on a police officer.
 {¶ 37} Nonetheless, while the trial court erred in stating that Gessner had been charged with obstruction of official business, the court did not err in considering whether probable cause existed for that crime. As the defendant officers note, the probable cause inquiry does not focus on offenses that officers subjectively contemplate at the time of arrest, nor is the inquiry limited to offenses with which a criminal defendant is actually charged. Instead, courts look at the known facts and whether those facts, viewed objectively, establish probable cause for the officers' actions. Devenpeck v. Alford (2004), 543 U.S. 146,153, 125 S.Ct. 588, 594, 160 L.Ed.2d 537. In fact, the offense establishing probable cause need not even be closely related to, or based on the same conduct as, the offense an arresting officer identifies at the time of arrest. 543 U.S. at 153-54. Accord, U.S. v.Abdi (C.A. 6, 2006), 463 F.3d 547, 558 (noting that the reason for arresting a defendant is constitutionally irrelevant, so long as an officer possessed facts at the time of arrest that would have furnished probable cause for the arrest).
 {¶ 38} Regarding disorderly conduct, the trial court relied on R.C.2917.11(A)(2), which provides that: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person." This statute has long been interpreted to require that a reasonable police officer would find the defendant's " `language and conduct annoying or alarming and would be provoked to want to respond violently. ` " City of Warren v. Patrone (1991), 75 Ohio App.3d 595,600 N.E.2d 344 (citations omitted).
 {¶ 39} In Warren, the defendant approached an officer and said that he had something to show her. The officer asked the defendant to leave her alone. Two hours later, the defendant again approached the officer with the parking ticket of a third person. The defendant crumpled the ticket, threw it at the officer, and said, "Here's what people think of your asshole tickets, asshole." 75 Ohio App.3d at 598. The court of appeals found that a reasonable officer would not have been provoked to an immediate breach, and that the trial court erred in finding that the defendant's conduct violated the statute prohibiting disorderly conduct. Id.
 {¶ 40} In the present case, the trial court relied on State v.Lorenzo, Lake App. No. 2001-L0053, 2002-Ohio-3495, as "most instructive." In particular, the trial court noted that theLorenzo defendant's utterance of "fuck you," after a police officer's reasonable warnings to calm down, "was not merely a personal insult towards the officer, but was also a refusal to desist which then authorized the officer to lawfully put the defendant under arrest for disorderly conduct." (Tr. Doc. # 48, p. 9).
 {¶ 41} We have reviewed Lorenzo, and find the factual background significantly different from that of the present case. InLorenzo, the police were called to the scene because of the defendant's own conduct, which involved a pushing match and altercation between the defendant and his own father. The police were told to get to the scene quickly because the son was beating the father. 2002-Ohio-3495, at ]}29. When the police arrived, the defendant appeared intoxicated and was repeatedly screaming, "Get this M'fer off my property." Id. at ¶¶ 3-4. The police also noticed that the father had large abrasions and red marks on his face. Id. Although an officer tried to defuse the situation by repeatedly instructing the defendant to calm down and relax, the defendant continued to scream loudly. After further attempts to bring the defendant under control were futile, the officer gave a final warning to the defendant that he should calm down or he would be arrested. The defendant answered, "Fuck you." Id. at ¶ 4. He was then arrested for disorderly conduct.
 {¶ 42} In contrast, Gessner, himself, called the police for help after hearing shots and seeing a man with a gun near Gessner's home. When the police failed to arrive, but were seen in the area, Gessner left his girlfriend with the apparent victim, and went to seek help. According to witnesses, Gessner told the police that he wanted the officers to come and get someone involved in the shooting from his back porch, and that his wife or girlfriend was at home alone with the individual. When the police did not respond, but told Gessner to "cease and desist" for the third time, Gessner said, "Fuck this," or "Fuck waiting," and started to walk back to his own house.
 {¶ 43} When material facts are controverted, courts may not weigh the credibility of witnesses or assess the relative value of their testimony when deciding motions for summary judgment. See, e.g., McGee v. GoodyearAtomic Corp. (1995), 103 Ohio App.3d 236, 243, 659 N.E.2d 317, andPerez v. Scripps-Howard Broadcasting Co. (1988), 35 Ohio St.3d 215, 218,520 N.E.2d 198. In discounting Gessner's testimony and accepting the testimony of the officers, the trial court improperly weighed the evidence.
 {¶ 44} Regarding obstruction of official business, the trial court relied on R.C. 2921.31(A), which states that:
 {¶ 45} "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."
 {¶ 46} The trial court did not address this issue in detail, but seems to have concluded that probable cause existed to arrest Gessner for obstruction because Gessner approached officers who were in the middle of an investigation, attempted to speak with them despite being told to wait, and continued to speak despite being told to cease and desist. The trial court also mentioned in its recitation of facts that the officers were not able to complete their investigation into the shooting incident because of Gessner's conduct and interference with their investigation. This conclusion appears to have been taken directly from statements in the affidavits of Schroeder and Pittman, who stated that they were not able to complete their investigation of the "shots fired disturbance" due to Gessner's conduct and arrest.
 {¶ 47} In Pullin v. City of Canton (N.D. Ohio, 2001),133 F. Supp.2d 1045, 1052, the district court found that factual issues precluded summary judgment on an officer's claim of qualified immunity. In that case, the police had stopped an automobile driven by a friend of the plaintiff. The plaintiff drove by, stopped her car, and got out. According to the officers, the plaintiff was combative and belligerent, and refused to leave the scene despite being ordered several times to do so. Id. at 1048. The plaintiff offered a different story, indicating that she came upon the scene only to see if she should contact her friend's family about his predicament. However, she was greeted with a barrage of questions and orders by the police, and started to leave the scene when requested. Id. at 1048-49. The district court noted that:
 {¶ 48} "Pullin [the plaintiff] offers evidence that Dittmore [the police officer] acted in an objectively unreasonable manner in arresting her for obstructing official business. To make the arrest, Dittmore had to reasonably suspect Pullin was purposely trying to prevent him from doing his job. But Pullin says she told Dittmore that she had come upon the scene only to see if she should contact Barksdale's family. She further says she started to leave the scene at Dittmore's first request. Under such circumstances, no reasonable officer would conclude that Pullin approached the scene with a `purpose to prevent, obstruct, or delay' official police business. Ohio Rev. Code § 2921.31." Id. at 1052 (bracketed material added).
 {¶ 49} In the present case, accepting Gessner's testimony as true, no reasonable officer would have concluded that Gessner approached the scene with the purpose of preventing, obstructing, or delaying official business. In fact, the evidence is to the contrary. Gessner's purpose was to aid the police, by alerting them to the whereabouts of the victim of the shooting, who was an actual eye-witness to the crime. Gessner specifically told the police this, so there would have been no misunderstanding about why he was there. Gessner was also attempting to obtain the help of the police, because he was concerned about a strange man being on his property. This does not indicate a purpose to delay or obstruct.
 {¶ 50} Although Gessner did persist after being told to cease and desist, there is no evidence (again, if Gessner's story is believed), that Gessner was trying to prevent, obstruct, or delay official police business. Gessner stated that Schroeder was not doing anything at the time Gessner began speaking to him, i.e., Schroeder was not questioning witnesses. Therefore, Gessner was not impeding or hampering Schroeder's ability to question anyone. Compare Burr v. Perkins (July 31, 2006), S.D. Ohio No. 2:04-cv-786, 2006 WL 2165701, *5 (viewing facts most favorably to plaintiff indicates that police officers did not have probable cause to arrest plaintiff for obstruction, where plaintiffs conduct was not done for the purpose of obstructing officers' ability to question individual and did not impede officers' ability).
 {¶ 51} We also note that there is a factual dispute about whether the investigation was impeded. The officers stated in their affidavits that they were not able to complete their investigation, due to Gessner's conduct. However, Petry testified that Mercer and Evans (the two alleged suspects who were more likely only witnesses), were placed in a police cruiser and were taken away. Therefore, Gessner does not appear to have prevented the officers from completing their investigation.
 {¶ 52} As a final matter, the trial court remarked in its decision that a party cannot create genuine issues of material fact by filing an affidavit that contradicts the party's prior deposition testimony. The reason for the court's comment is unclear, as there are not significant inconsistencies between Gessner's affidavit and his deposition testimony. The major inconsistencies seem to be between the two affidavits and the deposition testimony of Joseph Evans.
 {¶ 53} In Byrd v. Smith, 110 Ohio St.3d 24, 24-25, 2006-Ohio-3455,850 N.E.2d 47, the Ohio Supreme Court held that an "affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment." Id. at paragraph three of the syllabus. Byrd has been held inapplicable where contradictions occur in the testimony of non-parties, like Evans. See Walker v. Bunch, Mahoning App. No. 05-MA-144, 2006-Ohio-4680, at ?33.
 {¶ 54} Prior to the Byrd decision, we distinguished between contradictory affidavits of parties and those of non-parties. InClemmons v. Yaezell (Dec. 29, 1988), Montgomery App. No. 11132,1998 WL 142397, we noted that:
 {¶ 55} "A contradictory affidavit of a party witness should be disregarded. The party witness generally has the benefit of counsel to protect him from inadvertent misstatements. Therefore, when a party witness has given certain detrimental answers in a deposition, but subsequently, upon advice of counsel, sets forth averments in an affidavit in order to `clarify' or `correct' what was said in the deposition, the subsequent affidavit should be disregarded. The affidavit is being used as a self-serving device to avoid damaging admissions made by the party witness during his deposition.
 {¶ 56} "However, in a situation where a non-party witness has given certain testimony in a deposition and then given contradictory averments in a subsequent affidavit, the same factors are not present. Neither the litigant nor his attorney can prevent the non-party witness from deliberately or inadvertently misstating facts during the deposition, at least not to the same extent that the litigant as witness can be protected from inadvertent misstatements during a deposition. Moreover, statements made by the non-party witness in his deposition are not in the nature of judicial admissions." Id. at *5-6.
 {¶ 57} The above comments might also apply where witnesses sign affidavits and then later attempt to clarify their testimony, by affidavit or deposition. Because parties commonly draft affidavits for their own witnesses (as occurred on both sides in the present case), it is no wonder that conflicting testimony surfaces. As we mentioned earlier, the affidavits of the two police officers are virtually identical. However, witnesses to the same event would rarely have identical recollections. We also mentioned that Evans had signed one affidavit in favor of the defendants and another in Gessner's favor. These affidavits were drafted by the defendants' attorney and by Gessner, respectively. Again, the existence of conflicting versions is hardly surprising. We need not resolve these issues, however, since the trial court refused to consider Evans's second affidavit. Any conflicts in testimony are matters of credibility, to be weighed at trial.
 {¶ 58} Based on the preceding discussion, Gessner's First Assignment of Error is sustained. We stress that our decision is not intended to express any opinion on the merits or about the ultimate outcome of this case. We are merely holding that genuine issues of material fact preclude summary judgment.
 III {¶ 59} Gessner's Second Assignment of Error is as follows: 
 {¶ 60} "WHETHER OR NOT THE TRIAL COURT RULING PLAINTIFF WAS IN VIOLATION OF DISORDERLY CONDUCT AND OBSTRUCTION OF OFFICIAL BUSINESS WAS IN ERROR."
 {¶ 61} Gessner did not address this assignment of error separately, but combined it with his discussion of his First Assignment of Error. In this regard, Gessner contends that the trial court erred in finding that the police had probable cause to arrest him for disorderly conduct and obstruction of official business. Gessner alleges that the trial court failed to construe evidence in Gessner's favor, as is required on summary judgment, and also ignored factual disputes. We have previously discussed these matters, and have concluded that genuine issues of material fact preclude summary judgment. As a result, we conclude that Gessner's Second Assignment of Error has merit, and it is sustained.
 IV {¶ 62} Two points remain for consideration. The first is the summary judgment rendered in favor of Pittman and Carter. The trial court found that claims against these parties are barred by the statute of limitations. Specifically, the arrest occurred on November 15, 2001, and Gessner did not file a lawsuit against Pittman and Carter until January 21, 2005, more than three years later. Gessner had previously filed and dismissed another lawsuit, but he did not include Pittman and Carter in that suit. Based on these undisputed facts, the trial court held that Gessner had failed to comply with the two-year statute of limitations for Section 1983 claims.
 {¶ 63} The law is clear that a two-year statute of limitations applies to claims brought under Section 1983, Title 42, U.S. Code. See,e.g., Fifth Third Bank v. Cope, 162 Ohio App.3d 838, 853,2005-Ohio-4626, 835 N.E.2d 779, at]}43, citing Browning v.Pendleton (C.A.6, 1989), 869 F.2d 989, 992. In addition, Gessner has not raised this issue on appeal. Accordingly, the summary judgments rendered in favor of Pittman and Carter are Affirmed.
 {¶ 64} The final matter to be addressed is the trial court's discussion of excessive force. Although the trial court refused to allow Gessner to amend the complaint to allege excessive force, the trial court decided to consider the issue anyway. The court found that Shroeder's use of force was objectively reasonable under the circumstances, and rendered summary judgment on this point as well. On appeal, the City contends that we should not consider this issue, because it is not raised in Gessner's complaint. The City also claims that the matter has not been specifically assigned as error on appeal.
 {¶ 65} Gessner's complaint and appellate brief are not models of compliance with formal requirements. Nonetheless, paragraph sixteen of the complaint alleges that Schroeder assaulted and used force on Gessner in violation of Gessner's constitutional rights. The affidavits of the police officers address the issue of excessive force, by claiming that the officers used only the force necessary to arrest Gessner. The issue of excessive force and the alleged assault is also referred to several times in Gessner's appellate brief. Accordingly, we conclude that the issue has been sufficiently raised.
 {¶ 66} "Officers are privileged to commit battery when making a lawful arrest, but the privilege is negated by the use of excessive force. * * * If, under the totality of the circumstances, an officer unreasonably seizes a person by using excessive force, he violates that person's Fourth Amendment rights. * * * The reasonableness of force is measured by the facts and circumstances of each particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Alley v.Bettencourt (1999), 134 Ohio App.3d 303, 313, 730 N.E.2d 1067.
 {¶ 67} In Alley, the court of appeals reversed a summary judgment granted to police officers, due to evidentiary disputes about whether an officer was the initial aggressor. 134 Ohio App.3d at 313-14. Similarly, there are factual disputes in the present case about whether Schroeder was the initial aggressor and should have affirmatively refrained from seizing Gessner by force. In this regard, Gessner testified that he had started to walk home when Schroeder grabbed him and pinched him "very hard" on the biceps. Petry also testified that Gessner started to back away when he was grabbed by Schroeder. Whether the arrest was lawful, entitling Schroeder to use battery, and, if so, whether Schroeder's force was excessive under the circumstances, are matters to be resolved at trial, not on summary judgment. See Miller v. Leesburg (Dec. 1, 1998), Franklin App. Nos. 97APE10-1379, 97APE10-1380, 1998 WL 831404, *10 (where seizure is legally improper, any force used to effectual seizure is also improper). Accordingly, the trial court also erred in rendering summary judgement on the issue of excessive force.
 V {¶ 68} Gessner's First and Second assignments of error having been sustained, that part of the judgment of the trial court awarding summary judgment in favor of Schroeder is Reversed, that part of the judgment of the trial court awarding summary judgment to Pittman and Carter is Affirmed, and this cause is Remanded for further proceedings consistent with this opinion.
WOLFF, P.J., and DONOVAN, J. concur.