[Cite as *State v. Coleman*, 2014-Ohio-856.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY   COUNTY

STATE OF OHIO                                    :
                                                 :        Appellate Case No. 24955
    Plaintiff-Appellee                           :
                                                 :        Trial Court Case No. 2010-CR-3950
v.                                               :
                                                 :
OTTO COLEMAN                                     :        (Criminal Appeal from
                                                 :         Common Pleas Court)
    Defendant-Appellant                          :
                                                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of March, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by APRIL F. CAMPBELL, Atty. Reg. #0089541, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. #0084707, and BRENT E. RAMBO, Atty. Reg. #0076969, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.,

{¶ 1}    Otto Coleman appeals from his conviction and sentence on charges of aggravated

robbery, assault on a peace officer, and vandalism.

{¶ 2}     Coleman advances six assignments of error. The first and third challenge the sufficiency and weight of the evidence to support the aggravated robbery conviction. The second and fourth challenge the sufficiency and weight of the evidence to support the vandalism conviction. The fifth assignment of error challenges the trial court's finding that Coleman was competent to stand trial. The final assignment of error alleges ineffective assistance of trial counsel.

{¶ 3}     The present appeal stems from a traffic stop of Coleman's vehicle. On December 11, 2010, Dayton police officer Jonathan Seiter was performing traffic enforcement. He was wearing a police uniform and driving a marked cruiser. Seiter observed Coleman driving on Gettysburg Avenue with a headlight out. He performed a traffic stop based on the violation. After stopping Coleman's vehicle, Seiter approached on foot and interacted with him. The officer believed he smelled a slight odor of alcohol on Coleman's breath. In response to a request for his driver's license, Coleman opened the glove box. Seiter saw pill bottles inside and asked whose they were. Coleman denied ownership of the bottles and added, "What concern of yours is that?" Seiter described Coleman as "confrontational."

{¶ 4}     At that point, Seiter had Coleman step out of the vehicle. He intended to perform a weapons pat down before placing Coleman in the police cruiser for the duration of the stop. Coleman resisted a pat down, however, and the two men fought. During the altercation, Coleman obtained physical control over Seiter, pinning the officer in place and choking him. According to Seiter, Coleman "was not trying to get away." Seiter testified that he could feel Coleman tugging at the handgun he kept holstered on his belt. Seiter emphasized that Coleman did not just "brush up against" the handgun or "elbow" it. He testified that he actually felt a "tug" and that for a

"tug" to occur "[a] hand has to actually be on the grip and pulled." (Trial Tr. at 194-196). When asked again what he felt, Seiter stated: "[Coleman] tugged upward while his hand was on my gun." (*Id*. at 223). He expressed no doubt about Coleman grabbing his gun and tugging it up. (*Id*. at 228). While the fighting continued, Seiter tried to shield his taser and handgun from Coleman. He also tried to use a radio microphone on his shoulder to call for help. (*Id*. at 198-199). The radio unit stopped working, however, when Coleman pulled out the cord connecting Seiter's microphone to his radio. (*Id*. at 199-200).

**{¶ 5}** Another officer, James Mullins, testified about hearing a "garbled transmission," background scuffling, and a plea for help. (*Id*. at 158). Shortly thereafter, a civilian named Angela Pierce and police officer Christopher Colbert came to Seiter's assistance. (*Id*. at 203-204). Colbert noticed that Seiter's microphone cord was "torn off." (*Id*. at 237). For her part, Pierce testified that she was a passenger in a car stopped at a light when she looked over and saw Coleman and Seiter struggling. According to Pierce, she saw Coleman trying to grab Seiter's handgun. (*Id*. at 266). She witnessed Coleman "tugging" on the handgun more than once. (*Id*. at 267, 281).

**{¶ 6}** Based on the foregoing incident, Coleman was charged with the crimes set forth above. He initially pled not guilty by reason of insanity (NGRI) and obtained sanity and competency evaluations. The trial court held a hearing and found him competent. Coleman later withdrew his NGRI plea. Thereafter, he pled no contest to the charge of assaulting a peace officer. A jury found him guilty of aggravated robbery for attempting to remove Seiter's handgun and guilty of vandalism for damaging Seiter's radio. The trial court imposed an aggregate prison sentence of twelve and a half years. This appeal followed.

{¶ 7}     In his first assignment of error, Coleman challenges the legal sufficiency of the evidence to support his aggravated robbery conviction under R.C. 2911.01(B), which provides:

(B) No person, without privilege to do so, shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when both of the following apply:

(1) The law enforcement officer, at the time of removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties;

(2) The offender knows or has reasonable cause to know that the law enforcement officer is a law enforcement officer.

{¶ 8}     With regard to sufficiency of the evidence, Coleman claims Seiter was not acting "within the course and scope" of his duties   when the alleged handgun tug occurred. According to Coleman, Seiter lacked a lawful basis to order him out of his vehicle for a weapons pat down. Based on the premise that Seiter was violating  the Fourth Amendment when he attempted the pat down, Coleman insists that the officer could not have been acting within the course and scope of his duties. Indeed, Coleman reasons that "[a] law enforcement officer cannot be said to be acting within the course and scope of his official duties when said officer's actions operate to deprive a citizen of his Fourth Amendment rights." (Appellant's brief at 7).

{¶ 9}     Upon review, we find Coleman's argument to be without merit. For present purposes, we will assume, arguendo, that Seiter lacked authority to conduct a weapons pat down—an issue Coleman argues at length. Even if the attempted pat down violated the Fourth Amendment, we are unpersuaded that Seiter's act of attempting it took him outside the scope of

his duties as a police officer. Seiter's law-enforcement duties undoubtedly include making traffic stops, removing stopped drivers from their vehicles, and performing weapons frisks. Even if the frisk here violated the Fourth Amendment, a conclusion we do not make but assume for the sake of analysis, Seiter's act of performing it remained within the course and scope of his duties as a police officer.

{¶ 10} We disagree with Coleman's assertion that "[a] law enforcement officer cannot be said to be acting within the course and scope of his official duties when said officer's actions operate to deprive a citizen of his Fourth Amendment rights." Police officers occasionally do deprive citizens of their constitutional rights while acting in the course and scope of their duties. Federal law provides a remedy for such a situation in the form of an action under 42 U.S.C. §1983.[1] But even if an officer crosses the line and violates a suspect's constitutional rights, that does not mean he necessarily ceases to act within the course and scope of his duties.

{¶ 11} Here we harbor no doubt that Seiter was acting within the course and scope of his duties as a police officer when he made a traffic stop, ordered Coleman out of the vehicle, and attempted a weapons pat down. This remains true regardless of the accuracy of Seiter's belief that he was entitled to conduct the pat down. The facts of the present case bear no similarity to the

---

[1] To prevail on a §1983 claim, a plaintiff must prove that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States. *Searcy v. Dayton*, 38 F.3d 282, 286 (6th Cir.1994); *see also Koller v. Hoffkins*, D.Conn. No. 3:09-CV-00999, 2013 WL 7160331 (Dec. 23, 2013) ("It is uncontroverted that the Defendants, as on-duty Greenwich police officers acting in the course and scope of their duties, were at all times acting under color of law."). To obtain qualified immunity from liability for a constitutional violation in a §1983 action, an officer must establish, among other things, "'that he *acted within the scope of his discretionary authority* during the incident in question.'" (Emphasis added) *Gessner v. Schroeder*, 2d Dist. Montgomery No. 21498, 2007-Ohio-570, ¶ 33, quoting *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir.2000). Contrary to Coleman's argument, then, a police officer plainly can violate a suspect's constitutional rights while acting in the course and scope of his duties.

hypothetical situation described in Coleman's brief wherein an on-duty officer sexually assaults a citizen. Coleman suggests it makes no difference whether an officer is conducting an illegal frisk or an illegal sexual assault for purposes of determining whether the officer is acting in the course and scope of his duties. Coleman reasons:

> * * * [T]o say that our hypothetical officer was acting outside his official duties when committing the sexual assault, but that Officer Seiter was not acting outside his official duties "*enough*" when illegally detaining a citizen, would be to create a very murky and completely unpredictable world where police and citizens must make blind guesses about where an officer's conduct becomes "illegal enough." A decision creating such a dynamic would assist no one.

(Appellant's brief at 13).

{¶ 12}  Coleman's argument fails to persuade us. In no way can an officer's duties be said to include committing sexual assault. On the other hand, detaining and frisking suspects comfortably fits within the course and scope of an officer's duties. We see nothing "murky" about this distinction. For the reasons set forth above, we hold that Seiter was acting in the course and scope of his duties when he removed Coleman from the stopped vehicle and attempted a weapons frisk. Accordingly, Coleman's first assignment of error is overruled.

{¶ 13}  In his second assignment of error, Coleman challenges the legal sufficiency of the evidence to support his vandalism conviction under R.C. 2909.05(B)(1)(b), which provides:

> (B)(1) No person shall knowingly cause physical harm to property that is owned or possessed by another, when either of the following applies:

> * * *

(b) Regardless of the value of the property or the amount of damage done, the property or its equivalent is necessary in order for its owner or possessor to engage in the owner's or possessor's profession, business, trade, or occupation.

{¶ 14} Coleman claims the State presented legally insufficient evidence to establish that Seiter's radio is necessary for him to engage in his occupation of police work. Coleman disputes whether the State proved Seiter's radio is "necessary" and whether being a police officer qualifies as an "occupation" under the statute. (Appellant's brief at 15).

{¶ 15} Upon review, we conclude that the State presented legally sufficient evidence to obtain a conviction under R.C. 2909.05(B)(1)(b). Seiter's job as a police officer reasonably can be called an "occupation." Moreover, we have no trouble concluding that his radio is "necessary" for him to engage in his occupation. At trial, officer Mullins testified that members of the Dayton Police Department communicate with one another "via radio and computer." (Trial Tr. at 157). Specifically, he explained that each officer carries a portable radio and that most of them include "shoulder mikes." (*Id*.) This enables "everybody * * * to communicate with each other." *(Id*.). Seiter also addressed the necessity of the radio he carried. He explained: "We have to call our radio stops and we have to be able to communicate with each other for officer safety." (*Id*. at 186). Whenever Seiter is out of his cruiser, the portable radio he carries serves as his method of communicating with other officers. (*Id*. at 190). The facts of the present case demonstrate the necessity of Seiter's radio. During his altercation with Coleman, Seiter attempted to use his portable radio to call for help until Coleman disabled it. (*Id*. at 199-200).

{¶ 16} In arguing that the radio is not "necessary" for Seiter to engage in his occupation as a police officer, Coleman cites *In re J.A.J.*, 8th Dist. Cuyahoga No. 96506, 2011-Ohio-4824,

and *State v. Sullivan*, 8th Dist. Cuyahoga No. 94269, 2010-Ohio-5357. Both cases are distinguishable. The former case involved damage to benches and birdhouses on school grounds. The Eighth District found legally insufficient evidence to establish that the benches and birdhouses were "necessary" for the education of school children. *Sullivan* involved a broken window. The Eighth District found legally insufficient evidence to establish that the window was necessary for a neighborhood center to conduct business. Unlike the benches, birdhouses, and window at issue in the cases cited by Coleman, the evidence before us is legally sufficient to support a finding that Seiter's portable radio is necessary for him to work as a police officer. The second assignment of error is overruled.

{¶ 17} In his third assignment of error, Coleman contends his aggravated robbery conviction is against the weight of the evidence. In support, he merely incorporates by reference his prior argument that he cannot be convicted under R.C. 2911.01(B) because Seiter was not acting within the course and scope of his duties as a police officer. For the reasons set forth in our analysis of Coleman's first assignment of error, we disagree. The third assignment of error is overruled.

{¶ 18} In his fourth assignment of error, Coleman disputes whether the weight of the evidence supports his vandalism conviction under R.C. 2909.05(B)(1)(b). Once again, he simply incorporates his argument above about police work not qualifying as a "profession, business, trade, or occupation" and about Seiter's radio not being "necessary." We reject these arguments for the same reasons we rejected them in our analysis of Coleman's second assignment of error. Accordingly, the fourth assignment of error is overruled.

{¶ 19} In his fifth assignment of error, Coleman challenges the trial court's finding that

he was competent to stand trial. The essence of his argument is that the trial court abused its discretion when choosing between competing psychological evaluations to find that he had not overcome the statutory presumption of competence.

{¶ 20} The record reflects that Coleman filed a pre-trial motion for a competency evaluation. Ultimately, three psychologists assessed him in jail to determine his competence.[2] They reached different conclusions, which were discussed in their written reports and during a two-day competency hearing. Psychologist Scott Kidd met with Coleman for twenty to thirty minutes on February 9, 2011. Kidd concluded that Coleman had a severe mental illness that rendered him "unable to understand the nature and objectives of the proceedings, and unable to participate in his defense." (Competency Tr. at 25). Psychologist Thomas Martin testified as a prosecution witness. He met with Coleman twice for about an hour each time. The first meeting occurred on February 28, 2011. The second took place on March 7, 2011. Based on his assessment, Martin concluded that Coleman lacked symptoms associated with severe mental illness. (*Id*. at 62, 81). Martin also found that Coleman was competent to stand trial. (*Id*. at 66). Psychologist Bobbie Hopes testified as the court's witness. She met with Coleman on April 9, 2011. Based on the results of a test she administered, she determined that he was "definitely malingering" for the purpose of being found incompetent. (*Id*. at 92-94, 99). Although Hopes believed Coleman was competent to stand trial, she could not say so with reasonable psychological certainty because of his intentional lack of cooperation. (*Id*. at 99-100). Hopes did conclude that Coleman was mentally ill, but she explained that mental illness did not necessarily

---

[2]It appears from Coleman's brief that a fourth psychologist, Massimo DeMarchis, unsuccessfully attempted a competency evaluation. (*See* Appellant's brief, exhibit 4). DeMarchis' attempted evaluation is not discussed by Coleman in connection with his fifth assignment of error.

make a person legally incompetent. (*Id*. at 98-99). After reviewing the evidence presented, which included the expert evaluations and other testimony, the trial court filed a June 2, 2011 decision and entry finding that Coleman had not overcome the statutory presumption of competence to stand trial. (Doc. #23 at 5).

{¶ 21} On appeal, Coleman acknowledges that the trial court drafted a "thorough and well-reasoned decision" finding him competent. (Appellant's brief at 24). He argues, however, that the evidence of his incompetence "counterbalance[d] the trial court's reasoning to a point where a finding against [his] competency would have been virtually unavoidable." (*Id*.). In essence, he argues that the trial court's determination is against the manifest weight of the evidence. We disagree.

{¶ 22} "Pursuant to R.C. 2945.37(G), a defendant is presumed to be competent unless it is demonstrated by a preponderance of the evidence that he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense." *In re Bailey*, 150 Ohio App.3d 664, 2002-Ohio-6792, 782 N.E.2d 1177 (2d Dist.), ¶ 11. Having reviewed the record, we conclude that the evidence supports the trial court's competency finding and that its finding is not an abuse of discretion.

{¶ 23} Psychologist Kidd testified that Coleman kept his head down during most of the twenty-to-thirty-minute interview. Coleman mumbled and was sometimes unresponsive. Other times, he gave a brief answer. (Competency Tr. at 8). When Kidd inquired about the offenses at issue, Coleman responded that he had "hit" "the devil, Satan." (*Id*. at 9). Kidd testified that Coleman at times seemed "disoriented" or "confused" and made random comments like "kill, kill." (*Id*. at 10). Kidd acknowledged that a person might make comments about the devil and

killing to appear more disturbed than they are. (*Id*. at 11). Kidd also spoke to jail staff members who told him they were unable to get enough information from Coleman to prescribe medication. (*Id*. at 13). Kidd was unable to determine whether Coleman was malingering, but he did conclude that Coleman was severely mentally ill. (*Id*. at 14). Kidd's interview was relatively short because of the lack of information Coleman provided. (*Id*. at 24). Based on what he saw, Kidd opined that Coleman would be "unable to understand the nature and objectives of the proceedings, and unable to participate in his defense." (*Id*. at 25).

{¶ 24} Psychologist Martin reached a different conclusion. During his first visit, he started by reading an informed-consent form. Coleman indicated that he understood what had been read. (*Id*. at 45). Coleman agreed to answer questions but refused to sign the form. (*Id*.). Coleman also remembered having been evaluated by Martin approximately ten years earlier. (*Id*. at 46). Martin described Coleman as cooperative and responsive. (*Id*. at 47). When Martin asked about the pending charges, Coleman responded, "Fighting with those devils, the cops, hitting cops." (*Id*. at 49). Coleman was unaware of other charges against him. (*Id*. at 50, 79). Martin then inquired about the potential punishment Coleman faced. Coleman responded that he could go back to prison for up to 25 years if he lived that long. (*Id*.). Coleman also answered "no" when asked if he wanted to be punished severely. (*Id*.). When Martin inquired about the different types of pleas available and about the rules, functions, and participants in a court proceeding, Coleman simply waived his hand and said "no." (*Id*. at 51). Coleman did acknowledge, however, that he had spoken to his attorney. (*Id*.). He also responded appropriately to questions about his personal and psychiatric history. (*Id*. at 52-53). Martin testified that Coleman also made a number of requests. He specifically asked for "psychotropic medication." He asked to be sent to the Summit

Behavioral Healthcare Institution in Cincinnati. He asked not to be given electro-shock therapy, and he asked to be given the anti-anxiety medication Xanax. (*Id*. at 53-54). Martin found these requests significant because they demonstrated Coleman's ability to reason and reach his own conclusions regarding his needs and desires. (*Id*. at 55). Martin did not observe any symptoms of hallucinations, and Coleman was not taking any medications. (*Id.* at 57-58).

{¶ 25} During Martin's second visit, Coleman made less eye contact and was less engaged in the interview. (*Id*. at 60). Coleman responded to questions and was able to concentrate on what Martin was saying. (*Id*. at 61-62). Martin concluded that Coleman did not exhibit symptoms associated with severe mental illness. (*Id*. at 62). Martin acknowledged having reached a different conclusion when evaluating Coleman a decade earlier. At that time, Coleman had maintained a "delusional belief that he was the victim of persecution." (*Id*. at 63). Based on that delusional belief, Martin had diagnosed Coleman as being mentally ill in 2001. Martin explained that during the more recent evaluation, Coleman did not exhibit such a belief. (*Id*.). Contrary to Kidd's evaluation, Martin also did not observe Coleman suffering from a blunted affect or from psychomotor retardation. (*Id*. at 65). Based on his two hours of evaluation, Martin concluded that Coleman was competent to stand trial. (*Id*. at 66-67).

{¶ 26} Although the third psychologist, Bobbie Hopes, was unable to say whether Coleman was competent to a reasonable degree of psychological certainty, her testimony nevertheless contained useful information. At the outset of Hopes' evaluation, Coleman refused to move his chair to give her more room. (Id. at 90). He also yelled at her and repeatedly said "no, no, no" and "kill, kill, kill," (*Id*.). Hopes responded by telling him that she would leave if he was not going to cooperate. When she stood up to do so, Coleman agreed to talk. (*Id*. at 91). He

proceeded to respond to questions with only "yes" or "no" answers. (*Id.*). Hopes asked Coleman a series of yes/no questions that had definitively right or wrong answers. Coleman answered all of the questions correctly. (*Id.* at 92). She then administered an "SIRS" test to determine whether Coleman was malingering to be found incompetent. (*Id.* at 92-93). Coleman scored so high that 100 percent of people with his score in a research group were malingering. (*Id.* at 93). As a result, Hopes concluded that "he was definitely malingering." (*Id.* at 94). Although Coleman told her he experienced hallucinations, his answers to questions on the subject "were not what one would expect with somebody who was having genuine hallucinations." (*Id.* at 95). Hopes also observed no symptoms of hallucinations. (*Id.*).

{¶ 27} Hopes explained that Coleman answered certain questions appropriately. But when she would ask competency-related questions about his offenses or about how court works, he would start saying things like "kill, kill, kill" or "fight Satan." (*Id.* at 96-97). Hopes concluded that he deliberately was not answering the competency-related questions because he had been able to answer questions about himself, his circumstances, and his mental health. (*Id.*). She opined that he was capable of understanding her questions and communicating with her. (*Id.*). According to Hopes, he simply refused to do so at times. (*Id.* at 98). She testified that Coleman has a chronic mental illness. But she explained that having a mental illness does not mean a person is incompetent. Nor does it prevent a person from malingering. (*Id.* at 99). Although Hopes believed Coleman was competent, she could not say so to a reasonable degree of psychological certainty because he chose not to provide enough information. (*Id.* at 99-100). On cross examination, Hopes acknowledged an occasion in 2001 when Coleman had been found not guilty by reason of insanity. (*Id.* at 109). On re-direct, she recognized that the verdict of not guilty

by reason of insanity implied that he was competent to stand trial on the prior occasion. (*Id*. at 114).

{¶ 28} Based on the record before us, the trial court reasonably concluded that Coleman had failed to overcome the statutory presumption of competence by showing that he was incapable of understanding the nature and objective of the proceedings against him or of assisting in his defense. Although Coleman may have a mental illness, the testimony of Martin and Hopes and their written reports in particular support a finding of competence. Martin's evaluation suggests that Coleman is capable of understanding, interacting, responding appropriately, and making decisions based on his needs and desires. Hopes' evaluation suggests that he was malingering in an effort to be found incompetent and that he purposefully refused to provide meaningful answers to questions about the charges against him and the legal process. In short, the trial court's decision regarding competence is not against the weight of the evidence and is not an abuse of discretion. Accordingly, Coleman's fifth assignment of error is overruled.

{¶ 29} In his sixth assignment of error, Coleman alleges ineffective assistance of trial counsel. Specifically, he claims his attorney provided ineffective assistance by (1) failing to challenge the aggravated robbery and vandalism charges on the grounds set forth in his appellate brief, (2) failing to object to the State's admission of an exhibit, and (3) abandoning his NGRI defense.

{¶ 30} To prevail on his ineffective-assistance claim, Coleman must show that his attorney's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice exists where "there is a reasonable probability that, but for counsel's deficient performance, the

outcome would have been different." *Id.* at 694. On the record before us, we see no ineffective assistance of counsel.

{¶ 31} Coleman first asserts that his trial attorney failed to raise the substantive arguments addressed above regarding the sufficiency of the evidence to support the aggravated robbery and vandalism convictions. We disagree. Defense counsel made a general Crim.R. 29 motion at trial (Trial Tr. at 301), and we rejected Coleman's specific arguments above. Therefore, he cannot demonstrate deficient performance or resulting prejudice.

{¶ 32} Coleman next challenges defense counsel's failure to object to State's exhibit 2. At trial, officer Seiter identified the exhibit as being the radio microphone and cord he was wearing when Coleman assaulted him. (*Id.* at 200). Seiter also pointed out the damage Coleman did to the unit. (*Id.* at 200-201). On appeal, Coleman contends State's exhibit 2 is merely a random broken unit, not the actual unit Seiter possessed. Therefore, he argues that it was inadmissible and that his attorney rendered ineffective assistance by failing to challenge it. We disagree. Coleman's argument contradicts Seiter's testimony that State's exhibit 2 was his actual radio microphone and cord. (*Id.*). In light of this uncontroverted testimony, we see no reason why the exhibit would be inadmissible.

{¶ 33} Coleman's final argument challenges defense counsel's abandonment of the NGRI defense. Following Coleman's entry of his NGRI plea, he underwent a sanity evaluation performed by Dr. William Miller. After reviewing various records and interviewing Coleman twice for ninety minutes and seventy-five minutes, Miller filed a fifteen-page written evaluation and concluded that Coleman was legally sane at the time of his offenses. (*See* Appellant's brief, exhibit 5). Although Miller believed Coleman had some mental disorders, he determined, based

on his interviews, that Coleman was malingering psychosis and malingering a cognitive deficit. (*Id*. at pg. 13). Miller also concluded that Coleman "was not substantially impaired by symptoms of a mental illness at the time of his alleged offenses, and that he knew the wrongfulness of his actions." (*Id*.). The final two pages of Miller's report summarize his reasons for reaching these conclusions. As stated in his evaluation, those reasons include the following:

• Background information reveals previous involvement with the criminal justice system for violent felony charges outside the context of mental illness. With an established history, poor control of aggressive impulses better explains the events in question. * * *

• Mr. Coleman's report of the alleged offense includes many non-psychotic reasons for his actions. He said that he felt Officer Seiter was pushing on him too aggressively when searching him beside the car. He also indicated that he did not feel that it was right for Officer Seiter to pull him over for having his lights out. * * *

• Mr. Coleman's account, the video of the incident, and the statement by Officer Seiter all indicate that Mr. Coleman was irritated and frustrated by how he was treated before his arrest. This frustration would explain his behavior better than his report of auditory hallucinations and delusions which are not supported by any other sources of information.

• Mr. Coleman reported no symptoms at Grandview Medical Center shortly after the alleged assault, and he did not have signs of disorganization, mania, agitation, or psychosis associated with the delusional beliefs to which he

attributed his actions. * * *

     • Furthermore, at Grandview Hospital, the explanation of the event he offered clinicians was that the officer had attacked him. It incorporated no delusional elements, but rather argued an alternate version of the events.

     • Symptoms of command hallucinations and delusional dyscontrol that Mr. Coleman has described throughout his course of illness have been conveniently confined to episodes of criminal involvement and have not occurred outside that context. * * *

     • Had Mr. Coleman believed Officer Seiter was Satan, his actions leading up to the alleged assault were uncharacteristic of someone who believed he was in Satan's presence.

     • Mr. Coleman appeared to intentionally exaggerate or fabricate auditory hallucinations. * * *

     • Mr. Coleman also appeared to intentionally exaggerate or fabricate poor concentration, memory and a severe lack of orientation during our assessment. * * *.

(*Id*. at 14-15).

**{¶ 34}**  On appeal, Coleman contends his trial counsel provided ineffective assistance by withdrawing the NGRI plea after Miller's evaluation rather than seeking a second opinion and cross examining Miller about his opinions at trial. During a hearing below, defense counsel advised the trial court: "* * * Mr. Coleman and I have discussed seeking further medical opinion and desire no longer to pursue that, to not get the final, I'm assuming, or a second opinion from

another medical professional. Based upon our discussion and his conclusion, we would be withdrawing our not guilty by reason of insanity plea." (Plea negotiation Tr. at 4). Coleman argues that his trial counsel should not have allowed him to make the foregoing determination in light of counsel's argument that he was incompetent to stand trial.

{¶ 35} Upon review, we find no ineffective assistance of counsel arising from withdrawal of the NGRI plea after consultation with Coleman and after receiving Miller's evaluation. This court has recognized that the withdrawal of an insanity plea does not constitute ineffective assistance where a defendant makes his own informed choice to do so. *State v. Sinks*, 2d Dist. Montgomery No. 11428, 1990 WL 80582, *5 (June 13, 1990). "Certainly, a plea of insanity raises very serious questions for any person who makes it, and it is not one to be maintained by counsel once the accused himself has carefully elected to withdraw it." *Id*; *see also State v. Purcell*, 107 Ohio App.3d 501, 506, 669 N.E.2d 60, 64 (1st Dist.1995) ("The findings of the experts retained or appointed in this case uniformly indicate that appellant suffered from posttraumatic stress disorder, but that he was not insane according to Ohio law. We cannot say that trial counsel was ineffective in failing to pursue a defense of not guilty by reason of insanity where that defense was not supported by expert testimony.").

{¶ 36} Although Coleman claims he was incompetent to make the plea-withdraw decision, we determined above that he was competent to stand trial because he failed to overcome the statutory presumption of competence. In light of that determination, we see no error in trial counsel allowing him to withdraw his insanity plea. We note too that withdrawal of the NGRI plea may have been a reasonable trial tactic. Having reviewed Miller's evaluation, we find it quite damaging to Coleman's case and his claimed insanity defense. Defense counsel reasonably

may have calculated that the chances of obtaining a conflicting opinion were not good and that allowing a jury to see or hear about the contents of Miller's report through cross examination would do more harm than good. Therefore, we see no deficient representation or resulting prejudice.

{¶ 37} Coleman's citation to *State v. Brown*, 84 Ohio App.3d 414, 626 N.E.2d 1179 (8th Dist.1992), fails to persuade us otherwise. In *Brown*, the defendant did not enter an NGRI plea. The record nevertheless contained a psychological report finding the defendant sane at the time of his crimes. On appeal, the Eighth District reasoned:

We do find it troublesome that the appellant's counsel did not seek to question the examining psychiatrist as a witness when given an opportunity by the judge to challenge the report. Since the report itself has not been included as part of the record on appeal, we are unable to hold that this particular failure rose to the level of ineffective assistance of counsel.

However, trial counsel was assigned to represent a man who had no recollection of life for a period of several days, and no recollection of the crimes of which he was accused. His last memory is of speaking to his mother whom he believes is buried at a service station in Lakewood. He recalls the need to find a shovel so he can properly bury her at a cemetery in North Royalton. Appellant then "woke up" in the psychiatric unit of the Cuyahoga County Jail. There is no trial tactic or strategy which would reasonably have led trial counsel under such circumstances to fail to enter a plea of not guilty by reason of insanity on behalf of his client. Until such a plea was entered, the trial judge had no obligation to even

consider ordering the requested independent evaluation pursuant to R.C. 2945.39(A).

> This failure to enter a plea of not guilty by reason of insanity pursuant to Crim.R. 11 falls below an objective standard of reasonable representation. Appellant was prejudiced by the failure of counsel to bring before the court the only possible theory of defense to the charges against him.

*Id.* at 421-422.

{¶ 38} Upon review, we find *Brown* distinguishable in at least three pertinent ways. First, in the present case defense counsel did enter an NGRI plea. Second, in the present case the record does contain the report finding Coleman legally sane. Having reviewed that report, we believe trial counsel reasonably could have elected not to challenge it. Third, in the present case Coleman made his own informed choice to withdraw his insanity plea. In light of these facts, Coleman's reliance on *Brown* is unpersuasive. His sixth assignment of error is overruled.

{¶ 39} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck
April F. Campbell
Brock A. Schoenlein
Brent E. Rambo
Hon. Dennis J. Langer