[Cite as *State v. Walker*, 2022-Ohio-3849.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2022-CA-2 |
| | : | |
| v. | : | Trial Court Case No. 21-CRB-001-0360 |
| | : | |
| JESSICA R. WALKER | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 28th day of October, 2022.

. . . . . . . . . . .

DREW E. WOOD, Atty. Reg. No. 0084181, Special Prosecuting Attorney, Ohio Attorney General's Office, 615 West Superior Avenue, 11th Floor, Cleveland, Ohio 44113
    Attorney for Plaintiff-Appellee

JESSICA R. WALKER, Atty. Reg. No. 0080138, 3900 Otterbein-Ithaca Road, New Madison, Ohio 45346
    Defendant-Appellant, Pro Se

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Jessica R. Walker, appeals from her conviction in the Darke County Court of Common Pleas after a jury found her guilty of resisting arrest. In support of her appeal, Walker raises multiple arguments challenging the sufficiency and manifest weight of the evidence that was presented at trial to establish the lawful-arrest element of resisting arrest. For the reasons outlined below, Walker's conviction will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On June 28, 2021, Walker was charged by complaint with single counts of resisting arrest in violation of R.C. 2921.33(A), a misdemeanor of the second degree; disorderly conduct in violation of R.C. 2917.11(A)(3),(E)(3)(a), a misdemeanor of the fourth degree, telecommunications harassment in violation of R.C. 2917.21(A)(7), a misdemeanor of the first degree; and improper use of a 9-1-1 system in violation of R.C. 128.32(F), a misdemeanor of the fourth degree. Walker pled not guilty to all the charges, and the matter proceeded to a jury trial.

{¶ 3} At trial, the State presented testimony and audio-recorded evidence establishing that on June 28, 2021, Walker made seven non-emergency telephone calls to the Darke County Sheriff's dispatch center because she wanted to speak with a specific sheriff's deputy—Deputy Young—about past issues with her neighbors' stalking her. All of Walker's calls to the dispatch center were played for the jury and admitted into evidence as State's Exhibit 1.

{¶ 4} During Walker's initial call, the answering dispatcher asked Walker if she had

a criminal complaint, to which Walker responded: "No." State's Ex. 1 (07.43.06). The dispatcher testified that he put Walker on hold and contacted Dep. Young, who advised that he would only speak with Walker if she had a criminal complaint. After speaking with Dep. Young, the dispatcher advised Walker that Dep. Young would not speak with her since she did not have a criminal complaint. In response, Walker stated that she "needed to talk to Deputy Young about some past things that have happened." *Id.* at 07.43.35. Thereafter, the dispatcher once again explained to Walker that Dep. Young would not speak with her unless she had a criminal complaint. Walker then said: "Ok, I have a criminal complaint." *Id.*

{¶ 5} After Walker indicated that she had a criminal complaint, the dispatcher asked her to describe the complaint. Walker became agitated and made the following comments with escalating anger:

> I'm being stalked by my neighbors and Deputy Young has information about that that I want to speak with him about. I'm very concerned about this stalking and that the sheriff's office won't speak to me about it. That's my criminal complaint. That the sheriff's office isn't addressing the stalking situation. Is that good enough? Can I talk to somebody now? * * * Please put me in touch with somebody so I can talk about my criminal concerns about the stalking that is happening with my neighbors. Could you help that? Would that be okay?

*Id.*

{¶ 6} In response to Walker's comments, the dispatcher put Walker on hold and

transferred her call to Dep. Young's supervising officer, Sergeant Mullen. When Sgt. Mullen answered the call, Walker explained to Sgt. Mullen that she wanted to speak with Dep. Young about her neighbors' stalking her and complained that no one from the sheriff's office would speak with her. As Walker was talking to Sgt. Mullen, the call accidentally got cut off, and Walker became more agitated. Walker then called dispatch back and requested to speak with Dep. Young. The answering dispatcher, however, advised Walker that he had been directed to forward her calls to Sgt. Mullen. The dispatcher then reconnected Walker to Sgt. Mullen and Walker continued to tell Sgt. Mullen that she wanted to talk to Dep. Young about her neighbors' stalking her. Specifically, Walker told Sgt. Mullen that she wanted to know the details of a May 3rd telephone call between Dep. Young and her neighbors. Sgt. Mullen told Walker that he would follow-up with Dep. Young and call her back.

{¶ 7} Approximately three hours later, Walker called dispatch again and asked to speak with Sgt. Mullen. The answering dispatcher advised Walker that Sgt. Mullen was unable to speak with her because he was in a meeting and that Sgt. Mullen would call her back. Approximately 30 minutes later, Walker called dispatch again and requested to speak with a different sergeant. In response, the answering dispatcher advised Walker that the sergeant she requested was unavailable and then transferred her to the voicemailbox of Captain Linkous.[1] Walker then left an angry voice message for Capt. Linkous in which she complained about everyone hanging up on her. Walker also told Capt. Linkous in the message that she had two years-worth of information to discuss with

---

[1] Capt. Linkous has since been promoted to Chief Sheriff's Deputy, but for purposes of this appeal, we will refer to him as "Capt. Linkous."

him regarding her neighbors.

{¶ 8} After leaving the voice message, Walker called dispatch again and asked to speak with Sgt. Mullen. The answering dispatcher told Walker that he had been advised to transfer her calls to Capt. Linkous's voicemailbox and transferred the call despite Walker's protesting. Walker thereafter called the dispatch center's non-emergency line three more times. Unsatisfied with those efforts, Walker then made a 9-1-1 emergency call.

{¶ 9} During the 9-1-1 emergency call, Walker told the dispatcher that she had stalkers living next door to her and that she wanted someone to come out to her residence and deal with it. The dispatcher asked Walker what kind of stalkers she was speaking of, and Walker responded:

> The kind of stalkers that you guys won't answer my calls about when I tell you that they are shooting off guns around me and threatening me, that kind of stalker. I can't even get Captain Linkous. I have to get his voicemail and I can't get any sergeant or other deputy to come and respond to me. So, I guess I got to call into 9-1-1. Let's get this all recorded now. Please come help me with this stalker situation I've been dealing with for the last two years that I've been telling you about. Can you help me? * * * Send somebody who can do something. * * * I want you to come out here and take care of this situation for me and I'm not going to have you putting me into somebody's voicemail. This is an emergency. It is an absolute emergency. It's been going on for two years now. I am terrified. I am

terrified.

State's Ex. 1 (11.51.22).

{¶ 10} Capt. Linkous and Sgt. Mullen testified that they responded to Walker's 9-1-1 emergency call by making contact with Walker at her residence. The officers' encounter with Walker was video-recorded on Sgt. Mullen's cruiser camera, and the video was played for the jury and admitted into evidence as State's Exhibit 2. The video evidence showed that during the encounter, Capt. Linkous continually tried to ascertain what emergency had precipitated Walker's 9-1-1 call. In response to his inquiries, Walker continued to express concerns about her neighbors' stalking her and other past conduct that frightened her. Walker also indicated that she had called 9-1-1 because she had received a recording the previous day from Dep. Young concerning her neighbors, the contents of which frightened her as well.

{¶ 11} The video evidence showed that Walker became emotional and angry at the officers because she believed the sheriff's office had failed to address her ongoing concerns about her neighbors. Although Walker insisted her 9-1-1 call was based on an emergency, Capt. Linkous ultimately disagreed and instructed Sgt. Mullen to issue a citation for improper use of a 9-1-1 system.[2] Capt. Linkous testified that when Walker learned that she was being issued a citation, she walked toward him and asked him some questions. Capt. Linkous testified that Walker did not like his responses to her questions and "slapped [him] on the shoulder." Trial Tr. (Mar. 11, 2022), p. 210. Capt. Linkous

---

[2] On the video, Capt. Linkous tells Sgt. Mullen to "burn it," which Sgt. Mullen and Capt. Linkous testified meant for Sgt. Mullen to write a citation for improper use of a 9-1-1 system. Trial Tr. (Mar. 11, 2022), p. 174 and 220.

testified that Walker slapped or hit him four different times despite his telling her to stop. Capt. Linkous admitted that Walker's slaps were not "extremely forceful." *Id.* at 210. He also agreed that they were not something that would "cause [him] to react violently" or "create a violent response." *Id.* at 221-222.

{¶ 12} Continuing, Capt. Linkous testified that he told Walker: "[Y]ou hit me, you're going to go to jail." *Id.* at 211. Capt. Linkous testified that the final time Walker struck him he determined that he was going to take her into custody. Capt. Linkous testified that, at that point, he grabbed Walker's wrist and tried to put it behind her back, but she tensed up and started to resist. Although Capt. Linkous and Walker were not in view of the camera when these events took place, the following conversation could be heard on the cruiser camera video:

| Capt. Linkous: | Don't touch me. Don't touch me. |
| Walker: | Ah, that's funny. |
| Capt. Linkous: | Don't touch me. |
| Walker: | That's funny. (Walker laughing) |
| Capt. Linkous: | Don't touch me cause, you are going to go to jail. |
| Walker: | Uh oh. Cite me for touching him. I touched him. |

State's Ex. 2 (31:23 to 31:32).

{¶ 13} Eventually, Capt. Linkous and Walker moved into view of the cruiser camera and, at that point in time, the video showed Capt. Linkous attempting to restrain Walker at the hood of Sgt. Mullen's cruiser. Sgt. Mullen then came to assist Capt. Linkous as Walker continued to resist the officers' attempts to handcuff her. Specifically, the video

showed that Walker moved her arms, dropped to the ground, and kicked up her legs to prevent the officers from placing her in handcuffs. Walker also continued to resist after she was handcuffed, as she went limp and refused to move when the officers attempted to walk her to Sgt. Mullen's cruiser. Capt. Linkous testified that a third officer was called to the scene to assist them in getting Walker inside the cruiser. Video footage from the second, rear cruiser camera was admitted into evidence as State's Exhibit 3. That footage showed Walker resisting as the officers placed her inside the cruiser. The video also showed that Walker was smiling as she screamed for help and complained about the officers hurting her.

{¶ 14} After the foregoing evidence was presented at trial, the jury deliberated and found Walker guilty of resisting arrest but not guilty of disorderly conduct, telecommunications harassment, or improper use of a 9-1-1 system. The trial court sentenced Walker to a 90-day jail term with 89 days suspended and one day of credit for time served. The court also ordered Walker to serve one year of probation with mental health treatment and to pay a $250 fine and court costs.

{¶ 15} Walker now appeals from her conviction for resisting arrest, raising a single assignment of error for review.

## Assignment of Error

{¶ 16} Walker argues that her conviction for resisting arrest should be reversed because she was not lawfully arrested during the incident in question. Because resisting arrest in violation of R.C. 2921.33(A) is committed when a person, recklessly or by force,

resists or interferes with a *lawful arrest* of the person or another, we construe Walker's assignment of error as challenging the sufficiency and manifest weight of the evidence that was presented at trial to establish the lawful-arrest element of resisting arrest.

*Standards of Review*

{¶ 17} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 18} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier

of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*Lawful Arrest*

{¶ 19} To establish the offense of resisting arrest, the State was required to prove that Walker resisted a lawful arrest. *State v. Terry*, 2d Dist. Montgomery No. 26722, 2016-Ohio-3484, ¶ 26, citing R.C. 2921.33(A). " 'Although the arrest must be "lawful," it is not necessary for the state to prove that the defendant was in fact guilty of the offense for which the arrest was made to uphold a conviction for resisting arrest.' " *State v. Blair*, 2d Dist. Montgomery No. 24784, 2012-Ohio-1847, ¶ 8, quoting *State v. Sansalone*, 71 Ohio App.3d 284, 285-286, 593 N.E.2d 390 (1st Dist.1991), citing *State v. Hurst*, 1st Dist. Hamilton No. C-880706, 1989 WL 140010, *1 (Nov. 22, 1989).

{¶ 20} " 'An arrest is "lawful" if the surrounding circumstances would give a reasonable police officer cause to believe that an offense has been or is being committed.' " *Id.* In other words, "an arrest is lawful if it is made on probable cause." *State v. Crowder*, 2d Dist. Montgomery No. 22344, 2008-Ohio-3708, ¶ 16, citing *City of*

*Dayton v. Myers*, 2d Dist. Montgomery No. 16699, 1998 WL 425498, *5 (July 24, 1998). " 'Generally, probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Id.*, quoting 26 Ohio Jurisprudence 3d, Criminal Law, Section 646. *See also State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26, citing *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

{¶ 21} "[T]he probable cause inquiry does not focus on offenses that officers subjectively contemplate at the time of arrest, nor is the inquiry limited to offenses with which a criminal defendant is actually charged." *Gessner v. Schroeder*, 2d Dist. Montgomery No. 21498, 2007-Ohio-570, ¶ 37. That is, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (Citations omitted.) *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). "Instead, courts look at the known facts and whether those facts, viewed objectively, establish probable cause for the officers' actions." *Gessner* at ¶ 37, citing *Devenpeck* at 153. "In fact, the offense establishing probable cause need not even be closely related to, or based on the same conduct as, the offense an arresting officer identifies at the time of arrest." *Id.*, citing *Devenpeck* at 153-154.

*Probable Cause to Arrest for Disorderly Conduct*

{¶ 22} Walker first argues that there was no lawful arrest in this case because her arrest was based on a charge of disorderly conduct that was not supported by probable cause. Walker was charged with disorderly conduct in violation of R.C. 2917.11(A)(3), which provides that: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * [i]nsulting, taunting, or challenging another, under circumstances in which that conduct *is likely to provoke a violent response*[.]" (Emphasis added.) R.C. 2917.11(A)(3). Walker claims that the evidence established that her conduct on the day in question was not "likely to provoke a violent response" because Capt. Linkous specifically testified that her conduct did not cause him to react violently and was not the type of conduct that would create a violent response. Because of this, Walker claims that Capt. Linkous and Sgt. Mullen did not have probable cause to arrest her for disorderly conduct and therefore arrested her unlawfully.

{¶ 23} In *State v. Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967, this court explained that the question of whether a person provoked a violent response for purposes of committing disorderly conduct is determined based on an objective test and that " 'the officer need not in fact be inconvenienced, annoyed or alarmed, or personally provoked to a violent response.' " *Id.* at ¶ 47, quoting *Sansalone*, 71 Ohio App.3d at 286, 593 N.E.2d 390. " 'The question, instead, focuses on whether, under the circumstances, it is probable that a reasonable police officer would find the accused's language and conduct annoying or alarming and would be provoked to want to respond violently.' " *Id*.

{¶ 24} Ohio's Fourth, Twelfth, and First Appellate Districts have issued decisions holding that when there is no evidence establishing that a defendant engaged in conduct

that was likely to provoke a violent response, there is no probable cause to arrest the defendant for disorderly conduct, and, in turn, no lawful arrest on which to base a charge of resisting arrest. *See, e.g., State v. Lamm*, 80 Ohio App.3d 510, 515-516, 609 N.E.2d 1286 (4th Dist.1992); *State v. Maynard*, 110 Ohio App.3d 6, 673 N.E. 2d 603 (4th Dist.1996); *State v. Johnson,* 6 Ohio App.3d 56, 453 N.E.2d 1101 (12th Dist.1982); *Sansalone* at 286. With the exception of the First District case, *Sansalone*, the aforementioned cases are distinguishable from the instant case in that disorderly conduct was the only offense on which the resisting arrest charge could have been based. In contrast, Walker's conduct prior to her arrest resulted in her being charged with not only disorderly conduct, but two other arrestable offenses—improper use of a 9-1-1 system and telecommunications harassment.

{¶ 25} Similar to this case, in *Sansalone*, the defendant was charged with multiple arrestable offenses in addition to resisting arrest. Specifically, the defendant was charged with disorderly conduct and driving without a license. *Sansalone* at 285. The charges arose after the defendant called the arresting officer an "asshole" multiple times for issuing the defendant a parking citation. *Id.* at 285. Based on that conduct, the officer testified that he decided to pull the defendant over and charge the defendant with disorderly conduct. *Id.* at 286. After pulling the defendant over, the officer did a computer check on the defendant's driver's license and determined that the defendant's license was suspended. *Id.* at 285. The officer thereafter issued the defendant a citation for driving under suspension, and the defendant crumpled up the citation. *Id.* The officer then arrested the defendant for disorderly conduct and the defendant resisted the

arrest.  *Id.* at 285-286.

{¶ 26} Following a bench trial, the trial court in *Sansalone* found the defendant not guilty of disorderly conduct and driving without a license, but guilty of resisting arrest.  *Id.* at 285.  The defendant thereafter appealed her conviction for resisting arrest on grounds that the State failed to present sufficient evidence to establish that she had been lawfully arrested.  Upon review, the appellate court determined that there was nothing in the record indicating that a reasonable person would have found the defendant's conduct to be so annoying as to provoke a violent response, and thus concluded that there was no evidence establishing probable cause to arrest the defendant for disorderly conduct.  *Id.* at 286.  As a result, the appellate court found that the defendant's arrest was unlawful and reversed her conviction for resisting arrest.  *Id.*

{¶ 27} Although *Sansalone* is similar to this case, it is significant that *Sansalone* was decided 13 years before the United States Supreme Court issued its decision in *Devenpeck*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537.  As previously discussed, *Devenpeck* rejected the notion that the offense establishing probable cause for an arrest must be " 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest."  *Id.* at 153.  That is, an officer's "subjective reason for making an arrest need not be the criminal offense as to which the known facts provide probable cause."  *Id.* at 153.  Currently, "courts look at the known facts and whether those facts, viewed objectively, establish probable cause for the officers' actions."  *Gessner*, 2d Dist. Montgomery No. 21498, 2007-Ohio-570, at ¶ 37, citing *Devenpeck* at 153.  Therefore, because *Sansalone* was decided before

*Devenpeck*, we do not find it instructive, as it is possible that the facts known to the officer in *Sansalone* provided the officer with probable cause to arrest the defendant for driving without a license.

{¶ 28} In this case, although Capt. Linkous testified that he arrested Walker for disorderly conduct, per *Devenpeck*, Capt. Linkous's subjective reason for arresting Walker is irrelevant. When applying the principles set forth in *Devenpeck*, we find that even if this court were to conclude that the evidence failed to establish that the officers had probable cause to arrest Walker for disorderly conduct due to Walker's not engaging in conduct that would provoke a violent response, the evidence otherwise established that the officers had probable cause to arrest Walker for improper use of a 9-1-1 system in violation of R.C. 128.32(F).

*Probable Cause to Arrest for Improper Use of a 9-1-1 System*

{¶ 29} One commits improper use of a 9-1-1 system in violation of R.C. 128.32(F) when he or she "knowingly use[s] a 9-1-1 system for a purpose other than obtaining emergency service." R.C. 128.32(F). " 'Emergency service' means emergency law enforcement, firefighting, ambulance, rescue, and medical service." R.C. 128.01(N). In this case, there is no dispute that Walker knowingly called Darke County's 9-1-1 emergency line on the day in question. Therefore, for purposes of the probable-cause-to-arrest inquiry, the only issue is whether the evidence presented at trial established that a reasonable officer in Capt. Linkous's position would have believed that Walker called 9-1-1 for a purpose other than to obtain an emergency service.

{¶ 30} The video evidence established that when the officers responded to Walker's 9-1-1 call, Walker calmly met the officers in her driveway and was not in any distress. After approaching Walker, Capt. Linkous could be heard on the video asking Walker: "[W]hat's the emergency?" State's Ex. 2 (0:56 to 0:58). In response, Walker advised the officers that she had "a bunch of stalkers living next door to [her]." *Id.* (1:00 to 1:04). To clarify the purported emergency, Capt. Linkous asked: "What's going on right now?" *Id.* (1:09 to 1:11). To that, Walker responded: "Well right now is that you won't speak to me." *Id.* (1:11 to 1:14). Thereafter, Capt. Linkous continued to try and identify Walker's emergency and stated the following:

| | |
|---|---|
| Capt. Linkous: | So, we have more people close by. We have emergencies right now. You're telling me there is not really an emergency you just want to talk to us, is that correct? |
| Walker: | No, no, no, it's an emergency. It is absolutely an emergency. |
| Capt. Linkous: | How is it an emergency? |
| Walker: | These people live next to me. * * * Every moment that they're there and their existence is an emergency for me. |
| Capt. Linkous: | Okay. |
| Walker: | Yeah. You get what my emergency is? |
| Capt. Linkous: | No, I do not. |

State's Ex. 2 (1:29 to 1:53).

{¶ 31} Thereafter, Capt. Linkous continued to ask Walker what had occurred that day to precipitate her 9-1-1 call. The relevant portion of their conversation is set forth below:

Walker: What I think is, if we are going to talk about today, my concern is how much these people have stalked me.

\* \* \*

So, what I am really scared about is the gunfire and the drive bys and stuff like that. I'm scared about that.

\* \* \*

I'm frightened. I'm really really scared about these people. And I've been telling you about that for two years now. Right. And okay. \* \* \* These people are set up on me and I've been talking to you guys about that for a while now. And I think I have it pretty much all recorded. And I've been talking to other jurisdictions about it and I'm very scared. *And so, that's that's really what I'm calling about today. I don't want to talk to some voicemail or some shit like that. You know what I mean?*

\* \* \*

Capt. Linkous: Did something happen today? That--

Walker:        *Nah, I just feel like—no.*  I--I got--I picked up um ah you know last night-ish, maybe early this morning, um the ah recordings that I had asked for and I listened to them and one that was—ok, well there have been a lot of scary other ones that I have gotten from you guys that I've heard before now--but this one from Young, that is what I wanted to talk to you about.

(Emphasis added.)   State's Ex. 2 (3:38 to 8:19).

{¶ 32} Over the next 20 minutes, the conversation continued, and Capt. Linkous kept trying to ascertain Walker's emergency:

Capt. Linkous:        So today, tell me what the emergency is because we've investigated each individual case.   Every time you call in you have an urgent problem and I think we come down and investigated it, correct?

Walker:        Well, so that is the thing, I haven't been able to talk to deputy [inaudible]. * * * There's a lot going on here. There's a lot going on here that I haven't been able to talk to you guys about because you sort of cut me off.

* * *

*But I'm very scared and that is what I called you about today.*

* * *

Capt. Linkous: What is the specific problem? * * * What I'm asking you today, what was the specific thing that caused the problem today for you to feel the way you do? * * * What today has changed. You told me you watched or listened to a video or recording.

Walker: Of your deputy. Yep.

Capt. Linkous: There is no other specific situation or scenario going outside that recording [inaudible] is that correct?

Walker: *I'm not sure.* So, let's be clear. You have--you are acknowledging that you have reviewed everything I've brought to you since 2019?

Capt. Linkous: No, I have not. I just told you that. I have not.

Walker: Ok, then we are in kind of a weird spot, huh? Right. We can't really talk about anything. That is kind of the problem.

* * *

Capt. Linkous: You are the one who called us down here today and said you had an emergency.

Walker: *I do have an emergency. My emergency is you.* Do you get it? Do you get what I'm saying? Right.

Capt. Linkous: So, you really don't have an emergency.

Walker: I do.

Capt. Linkous:     Okay.

Walker:     Oh, it doesn't count if it's you?   Right.

Capt. Linkous:     I wasn't here at the time.

Walker:     No, no, no.   When I called you about the emergency, *that is you*. You're saying that doesn't qualify as an emergency.   Is that what you're saying?

Capt. Linkous:     So, what you are saying is that you called 911 just to get us down here so you could talk to us.

Walker:     No, no, no. * * * (Walker continues talking over Capt. Linkous)

(Emphasis added.)   State's Ex. 2 (16:10 to 26:22).

**{¶ 33}** The video-recorded conversation and the testimony presented at trial indicated that Walker called 9-1-1 because, after calling Darke County's non-emergency line several times, she was unable to speak with Dep. Young or any other officer about her concerns with her neighbors' past conduct and about the audio-recording that Dep. Young had provided her the previous day.   During her conversation with Capt. Linkous, Walker repeatedly indicated that she was afraid of her neighbors, but she never described an active emergency for which she needed an emergency service.   Instead, Walker discussed events from the past and her issues with calling dispatch that day.

**{¶ 34}** When viewing the evidence in a light most favorable to the State, a rational factfinder could have concluded that the facts and circumstances within Capt. Linkous's knowledge were sufficient to warrant a reasonable officer to believe that Walker knowingly

called 9-1-1 for a purpose other than to an obtain an emergency service and, by doing so, she committed the offense of improper use of a 9-1-1 system in violation of R.C. 128.32(F). Therefore, under the circumstances of this case, we find that there was sufficient evidence presented at trial to establish that Capt. Linkous had probable cause to arrest Walker for that offense.

{¶ 35} Simply because Capt. Linkous chose to cite Walker for improper use of a 9-1-1 system and later arrested her for disorderly conduct is irrelevant to the probable-cause-to-arrest determination. As previously discussed, an officer's "subjective reason for making an arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck,* 543 U.S. at 153-154, 125 S.Ct. 588, 160 L.Ed.2d 537. All that matters is that the facts and circumstances known to Capt. Linkous provided probable cause to arrest Walker for improper use of a 9-1-1 system.

{¶ 36} Because the State presented sufficient evidence of probable cause to arrest Walker, there was, in turn, sufficient evidence for the jury to find that Walker was lawfully arrested for purposes of finding her guilty of resisting arrest. After reviewing the entire record and weighing all the evidence and reasonable inferences, we do not find that the jury's determination in that regard created a manifest miscarriage of justice that warrants a reversal of Walker's conviction. Therefore, in addition to being supported by sufficient evidence, Walker's conviction for resisting was also not against the manifest weight of the evidence.

*Seizure Constitutes Arrest*

{¶ 37} As an alternative argument, Walker claims that there was no lawful arrest to support her resisting arrest conviction because the evidence established that the officers' seizure of her person did not constitute an actual arrest. Walker claims that her seizure did not constitute an arrest because she did not understand or know that she was being arrested due to the officers failing to tell her that she was under arrest.

{¶ 38} This court has explained that:

An arrest can occur under either of two circumstances. This first of those circumstances is a formal arrest where the officer explicitly and unequivocally informs the subject that he or she is under arrest. The second, and less clear, circumstance is when a police officer performs a seizure of the subject that is tantamount to an arrest. A seizure is sufficient to give rise to an arrest when: 1) there is an intent to arrest; 2) under real or pretended authority; 3) accompanied by an actual or constructive seizure or detention; and *4) which is so understood by the person arrested.*

(Emphasis added.) *State v. Qualey*, 2d Dist. Montgomery No. 16705, 1998 WL 403881, *4 (Mar. 27, 1998), citing *State v. Darrah,* 64 Ohio St. 2d 22, 26, 412 N.E.2d 1328 (1980).

{¶ 39} We note that "an officer is not required to specifically state that a person is under arrest in order to effectuate an arrest." (Citations omitted.) *State v. Hagstrom*, 12th Dist. Butler No. CA98-07-157, 1999 WL 527785, *4 (June 21, 1999). *Accord State v. Carroll,* 162 Ohio App.3d 672, 2005-Ohio-4048, 834 N.E.2d 843, ¶ 14 (1st Dist.); *State v. Maurer*, 15 Ohio St.3d 239, 255, 473 N.E.2d 768 (1984). The evidence, however, "must show that the subject of an arrest should reasonably have understood that such a

seizure occurred." *In re B.M.*, 2d Dist. Montgomery Nos. 25093, 25206, 2012-Ohio-6221, ¶ 14, citing *State v. Hatch*, 2d Dist. Montgomery No. 18986, 2002 WL 10449 (Jan. 4, 2002). "A seizure is an arrest * * * if a 'reasonable person' in the suspect's position would have understood the situation to constitute a restraint on his [or her] freedom of movement of the degree the law associated with formal arrest." *Hatch* at *4, citing *United States v. Corral-Franco,* 848 F.2d 536 (5th Cir.1988).

{¶ 40} In this case, we find that a rational factfinder could have concluded from the video evidence that a reasonable person in Walker's position would have understood that Capt. Linkous and Sgt. Mullen were restraining her for purposes of placing her under arrest. In reaching this conclusion, we rely on the following conversation that can be heard between Walker and the officers just prior to the officers' restraining Walker:

| | |
|---|---|
| Walker: | Hi Sergeant Mullen, what you got for me? |
| Sgt. Mullen: | Citation. |
| Walker: | A citation. Uh oh. What a surprise. |
| | * * * |
| | (Walker continues talking to Capt. Linkous out of the camera's view.) |
| Capt. Linkous: | Don't touch me.  Don't touch me. |
| Walker: | Ah, that's funny. |
| Capt. Linkous: | Don't touch me. |
| Walker: | That's funny. (Walker laughing) |
| Capt. Linkous: | Don't touch me, *cause you are going to go to jail.* |

Walker:                Uh oh.   Cite me for touching him.   I touched him.

Capt. Linkous:      Stop resisting.   Stop resisting.   Stop resisting.   I do not want to hurt you.   Stop resisting.   Stop resisting. Stop resisting.

(Emphasis added.)   State's Ex. 2 (30:04 to 32:00).

**{¶ 41}** Although Walker and the officers were not in view of the camera when the foregoing conversation took place, the conversation indicated that Capt. Linkous began attempting to place Walker in custody after she continued to touch him against his wishes and after he told her she was "going to go to jail."   This is because soon after Capt. Linkous told Walker that she was going to jail, Capt. Linkous and Walker moved into view of the camera and Capt. Linkous could be seen attempting to handcuff Walker at the hood of Sgt. Mullen's police cruiser while Walker resisted.   While she was resisting, Walker also asked the officers: "What are you going to do?   Are you going to take me to jail?" and Capt. Linkous responded: "Yeah."   *Id.* (32:35).

**{¶ 42}** Based on Capt. Linkous and Walker's conversation and their actions, we find that a rational factfinder could have concluded that a reasonable person in Walker's position would have believed that he or she were being arrested and taken to jail. Therefore, Walker's alternative claim that there was insufficient evidence showing that there was an arrest underlying her resisting arrest conviction lacks merit.

**{¶ 43}** Because the lawful-arrest element of resisting arrest was supported by sufficient evidence and because the weight of the evidence supported the jury's finding that the lawful-arrest element was established beyond a reasonable doubt, Walker's sole

assignment of error is overruled.

## Conclusion

**{¶ 44}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and LEWIS, J., concur.

Copies sent to:

Drew E. Wood
Jessica R. Walker
Hon. Julie L. Monnin